UNITED STATES v. ATCHISON, T. & S. F. RY. CO.

(District Court, D. Colorado. January 19, 1907.)

No. 1,953.

RAILROADS—SAFETY APPLIANCE ACT—DEFECTIVE CAR COUPLINGS—MISTAKE OF FACT.

Act Cong. March 2, 1893, § 2, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], requires all cars used in interstate commerce to be equipped with automatic couplers which can be uncoupled without the necessity of men going between the ends of the cars, and section 6 (27 Stat. 532 [U. S. Comp. St. 1901, p. 3175]) provides a penalty of $100 for each violation of the act. *Held*, that such act was penal in its nature, and that a mere failure of defendant railroad company's inspectors on first inspecting a car before delivering it to a connecting carrier to discover that the chain attached to the lever by which the automatic coupler was operated was broken, the same having been discovered and repaired on a subsequent inspection before delivery to the connecting carrier, did not constitute a violation of such act.

[Ed. Note.—Duties of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

At Law.

This action is for the recovery of $100 as a penalty for the violation of the safety appliance act, approved March 2, 1893, c. 196, § 2, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], and the amendments thereto (Act April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3175], and Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1905, p. 603]), in that, as alleged, the defendant "hauled over its line of railway one car, to wit: S. W. S. C. 2511, used in moving interstate traffic * * * when the coupling and uncoupling apparatus on the A end of said car was out of repair and inoperative, the chain connecting the lock pin, or lock block, to the uncoupling lever being broken on said end of said car, thus necessitating a man, or men, going between the ends of the cars to couple or uncouple them," etc.

On the trial the following facts appeared: The car in question was a loaded freight car brought from Fierro, in the Territory of New Mexico, consigned to the C. F. & I. Co., at Minnequa, a suburb of Pueblo in the state of Colorado. The defendant brought it from the east in one of its freight trains, composed of about forty cars, arriving at its yards in Pueblo at about 7:30 p. m., March 30, 1906. This string of cars remained in its yards overnight. Immediately on arrival, four of defendant's servants, whose duties consist exclusively of inspecting cars on arrival, inspected this string of cars, two working from the rear and two from the front end of the train. These men were equipped, each with a long handle lantern made for that purpose, in order that the light might be placed under and between the cars, for the purpose of thoroughly inspecting their condition. They found no defect in this car, although defects in other cars were discovered and repaired. The next morning about eight o'clock, witnesses Ensign and Wright, acting in the discharge of their duties as government employés, discovered on this car the defect complained of. At that time there were about twenty cars in the string. These two witnesses remained with the car until about 11 a. m. The string of twenty cars was first moved to another part of the yards by the defendant, to what was called the

"rabbit" track, where they were cut in two, and the car in question, with several others attached to it, was then taken by the defendant to the transfer track for delivery to the C. & W. R. R., to be taken by it to Minnequa. On reaching the transfer track, one of the defendant's repair men discovered the broken chain in question and immediately repaired it. Shortly after it was repaired, joint inspectors employed by the defendant and other roads entering Pueblo, as was their custom, inspected this string of cars for the purpose of discovering defects, if any, before delivery to the C. & W. road. No defect was found by them on this car, as the one in question had been repaired shortly before they reached it. It did not appear from the evidence to what extent, if any, the car in question had been handled during the night of March 30th, and after it had been inspected on first reaching the defendant's yards. Neither did it appear that anyone was required to go between the cars to couple or uncouple them on account of the defect after it was discovered by the government's witnesses. The jury found a verdict for the defendant.

E. M. Cranston, U. S. Atty., and Luther M. Walters, for the United States.

Henry T. Rogers, for defendant.

LEWIS, District Judge (after stating the facts). The motion for a new trial is leveled against the instructions of the court; because, first, the jury were directed that the defendant was held to reasonable care and diligence in the inspection of its cars, and if it used such care, and did not discover the defect in question, it was not liable; and, second, the defendant was held to reasonable care in putting the coupling in good repair after it ascertained that it was out of repair.

The action seeks to recover a forfeiture. The statute, for the purposes now under consideration, is penal. Johnson v. So. Pac. Co., 196 U. S. 1, 17, 25 Sup. Ct. 158, 49 L. Ed. 363.

Counsel for the government insists that the defendant should be held to the letter of the act, and that, on proof of a defective coupling that will not operate as provided in the act, the liability of the defendant is absolute. In support of that contention he cites U. S. v. Southern Ry. Co. (D. C.) 135 Fed. 122. This rule makes the railway company an insurer of the workable condition of its couplers at all times—indeed, at every instant; therefore, when a coupler becomes defective, as it must, it results in a race of vigilance between railroad employé and government agent as to who shall get there first. Indeed, the very act of repairing a defective coupler, which will not operate, makes a case and works a forfeiture. I have not been able to bring myself to this view. The act was passed for practical purposes. It does not assume the impossible, and lay a forfeiture against the laws of nature; for couplers must break.

The cases cited by Judge Humphrey in U. S. v. Southern Ry. Co., supra, are exceptional. They are departures from the general rule. They do not announce the better rule. They have been sharply criticised.

In Bishop on Statutory Crimes (2d Ed.), at section 1126, the author had under consideration statutes making it an offense to sell adulterated milk, and it is there said:

"One or two of our courts have holden that where the statute is silent concerning the seller's knowledge, if, however honestly and after whatever precautions, he is misled to believe the milk to be pure, he is punishable should it

turn out to be adulterated. Yet, by the just doctrine, an unavoidable mistake of the fact, by one whose purpose it is to obey the law, relieves him from legal guilt, the same as from moral, precisely as in other criminal cases."

In a footnote the author cites an English case where one was indicted for mixing alum in bread, and it is said that Hannan, J., held:

"The provisions of the act cast great responsibility on the master baker; but I cannot think it to have been the intention of the Legislature that he should be liable to a penalty for anything that occurs by accident. If this were so, the master might be punishable when some foreign ingredient had fallen into the flour without the knowledge of either himself or his servant."

And again, the same author in the same work, at section 1022, in considering penal statutes against selling intoxicating liquor to minors, says:

"Under these statutes, the question of the effect of a mistake of fact, discussed or adverted to in several other connections, has often arisen. It is not proposed to repeat the former discussions; they are referred to in a note, and the reader is requested to examine them. The result, derivable both from the places referred to and from the decisions under the present head, is that one whom the law permits to sell intoxicating liquor, and whose purpose and endeavor it is to conform to the law in all things, and to do no wrong of any sort, is legally, the same as he is morally, justified in acting, like other people in respect of other things, on what upon careful investigation and inquiry appear to be the facts; so that, if believing the appearances he does what would be legally and morally right were the real facts so, he is not punishable though he was deceived and they were different. Thus, if one authorized to sell liquor to adults and forbidden to sell it to minors is, without his fault or carelessness, led to believe an applicant to be an adult while truly he is a minor, he is not punishable though he makes the sale—a proposition which some deny."

And in the same work, at section 132:

"A statute will not generally make an act criminal, however broad may be its language, unless the offender's intent concurred with his act; because the common law does not."

"One who, while careful and circumspect, is led into a mistake of facts, and, doing what would be in no way reprehensible were they what he supposes them to be, commits what under the real facts is a violation of a criminal statute, is guilty of no crime; because such is the rule of the common law, and in construction it restricts the statute."

In Bishop on Criminal Law (7th Ed.) vol. 1, there will be found a footnote to section 303a dealing exhaustively with the subject now under consideration, wherein the rule announced in the cases cited by Judge Humphrey in the Southern Railway Case above is vigorously combatted.

In U. S. v. Beaty, Fed. Cas. No. 14,555, the action was for debt, as here. The defendant was sued for the penalty of $150, for that he was the master of a steamboat, and as such had received a letter which he failed to deliver at the post office at destination, in violation of the act of Congress. It appeared from the evidence that the letter was in the custody of a clerk on the boat, of which fact the defendant was ignorant. It was there said:

"The act is penal in its consequences, and must be strictly construed; and as knowledge is generally a principal and indispensable ingredient in offenses it would seem reasonable to hold the government to the proof of it, or to the proof of circumstances from which it might be fairly inferred, before the penalty can be demanded. The master of a steamboat is liable for this penalty

when he fails to deliver a letter or packet which has been brought by him, or was in his care, or was in his power; but, in my judgment, the sound construction of the act of Congress is that the defendant could not be placed in this category at all, where the letter was not within his knowledge, nor placed in a situation to enable him, with the use of reasonable diligence, to obtain such knowledge. Knowledge on his part, express or implied, I regard as essential to his liability, and without which the acts of Congress have no application, and do not embrace the case. It is not to be supposed that it was the intention of the lawmaker to inflict a penalty upon the master of a steamboat in a case where he was ignorant that a letter had been brought upon the boat, either by the clerk or any person employed on board, and had not the means of ascertaining the fact by the use of reasonable diligence. This would be little less unjust than the disreputable device of the Roman tyrant who placed his laws and edicts on high pillars, so as to prevent the people from reading them, the more effectually to ensnare and bend the people to his purposes."

State ex rel. v. Railway Co. (C. C.) 32 Fed. 722, is inapposite.

In Anglo-Saxon jurisprudence, both criminal and civil, the principle, ignorantia facti excusat, is as old as the books.

In addition to this, the defendants in the cases cited by Judge Humphrey were private citizens—volunteers in their business for private gain; whereas the railroad company discharges a public duty. It is under an obligation to the public to move its cars for public traffic. The evidence shows that the inspection of this car on the night it arrived at Pueblo was thorough and by competent men, and that when it would reach the transfer track the next day it would be inspected again by joint inspectors before delivery to the C. & W. Railway Co. It was repaired, however, in the particular complained of on reaching the transfer track—doubtless the presence of the government agent had called the attention of one of the defendant's employés to the defect. The defendant certainly exercised more than reasonable diligence in searching for defects in the car, and it promptly repaired the one in question immediately on its discovery.

It may be said that the facts in the case considered by Judge Humphrey did not disclose sufficient care and diligence to submit that question to the jury. Indeed, from the facts there recited, it might be safely said that that defendant was grossly negligent.

Under the facts here I do not believe the defendant is liable for the penalty. The verdict, in my judgment, was for the right party, and I do not find prejudicial error in the matters complained of. The motion for a new trial ought to be overruled. It is so ordered.