UNITED STATES v. ILLINOIS CENT. R. CO. (two cases).

(District Court, W. D. Kentucky. November 1, 1907.)

1. RAILROADS—SAFETY APPLIANCE ACT—CONSTRUCTION.
Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], which makes "unlawful" certain acts by common carriers engaged in interstate commerce by railroad, and provides that for a violation of its provisions such a carrier shall be liable to a penalty, to be recovered in a suit to be brought for the purpose, is a criminal statute creating public offenses, and is to be construed in accordance with the rules governing the construction of such statutes, and trials thereunder are governed by the rules of criminal procedure and evidence; the defendant being presumed innocent until every element necessary to constitute the offense has been proved beyond a reasonable doubt.
[Ed. Note.—Duty of railroad companies to furnish safe appliances, see note to Fulton v. Ballard, 37 C. C. A. 8.]

2. SAME—VIOLATION OF ACT—ELEMENTS OF OFFENSE.
A railroad company is not guilty of a violation of the provisions of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St.

1901, p. 3174], by using on its line in moving interstate traffic an engine or car not equipped as therein required, if it was properly so equipped at the beginning of its interstate journey, but became defective during such journey, unless such company failed to supply the deficiency at the first opportunity after it was actually discovered, or should have been discovered by the use of the utmost care that a highly prudent man would use under the circumstances of the case.

**3. SAME.**

To entitle the United States to recover the prescribed penalty for a violation of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], by using a car not equipped as required, it must prove beyond a reasonable doubt the following facts: First, that the car was used in hauling interstate traffic; second, that when so used it was either not equipped or provided with the required safety appliances at all, or else that some part of those appliances had become inoperative; and, third, if those appliances were all in good order and condition when the car was originally started on its interstate journey, and afterwards became defective in transit, that the defects had respectively been either in fact discovered by the carrier, or else that they could have been discovered and corrected by it by the exercise of the utmost degree of care and diligence which could be expected at the hands of a highly prudent man under similar circumstances.

**4. SAME.**

Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], while in terms it requires only that engines and cars shall be "equipped" with the required appliances, must be construed to mean equipment which, if there, is capable of being operated, and that it shall be kept in good order and repair; but it cannot be construed to require that the equipment shall in fact be efficiently operated by those in charge of the train.

**5. SAME.**

In case of an empty car being hauled in an interstate train, in order to subject the carrier to the penalty prescribed for violation of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], for a failure to have such car equipped with the required safety appliances, it must be shown that the car was used or intended to be used in moving interstate traffic.

On Trial by the Court Without a Jury.

George Du Relle, Dist. Atty., and Luther M. Walter, for the United States.

Trabue, Doolan & Cox, for defendant.

EVANS, District Judge. Section 1 of the act of March 2, 1893 (27 Stat. 531, c. 196 [U. S. Comp. St. 1901, p. 3174]), as amended, known as the "Safety Appliance Act," provides that:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving wheel brake and appliances for operating the train brake system."

Section 2 provides that:

"It shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

Section 4 provides that:

"It shall be unlawful for any railroad company to use any car in interstate commerce that is not provided with secure grab-irons or handholds in the

ends and sides of each for greater security to men in coupling and uncoupling cars."

Section 5 forbids the use of cars in interstate traffic which are not provided with a standard drawbar.

Section 6 provides that any common carrier who shall violate any of the provisions of the act "shall be liable to a penalty of $100 for each and every violation, to be recovered in a suit or suits to be brought" in the District Courts of the United States having jurisdiction in the locality where the violation shall have been committed.

Under these provisions these suits were brought by petition as in a civil action at law, and in 27 separate paragraphs the plaintiff has charged the defendant with that many separate violations of the statute. One of these was under section 1, 18 under section 2, 7 under section 4, and 1 under section 5. The defendant, by pleading, raised the issue as to whether it was guilty of any one of the alleged violations of law, and by stipulation the cases were heard by the court without a jury. The testimony developed no very difficult questions of fact, but the questions of law involved, and which were argued at length, are not only of great importance, but are difficult and perplexing, in the absence of authoritative rulings by the higher courts.

That the enforcement of the safety appliance act is demanded, alike because it is a law of the United States and because it was intended to serve an extremely important purpose, goes without saying. The laws of the United States are made to be enforced; but this implies and requires that the courts, when appealed to for that purpose, shall with rigid impartiality and the utmost care endeavor to ascertain what the law is which is to be enforced. If the courts fail in this, they may on the one hand enforce what Congress did not intend to be law, or on the other permit persons to escape who ought to be punished. These cases have strenuously exacted this character of labor, although a casual reading of the clauses of the act above cited might not suggest it.

And, first, we must definitely determine whether the act creates "criminal offenses," for, until we do this, we cannot say what rules of construction must govern, nor whether certain rules of evidence should be applied, namely, rules in civil or rules in criminal cases. The fourth clause of the act authorizes "suits" to be brought for the recovery of the penalties, and from this fact it seems in some jurisdictions to have been inferred that the liability imposed was in the nature of a mere indebtedness, and consequently that the rule as to preponderance of evidence should be applied. The language used in sections 1, 2, and 4 is alike that certain acts shall be "unlawful." Before the passage of the law such acts were not unlawful, and the statute for the first time made them so. For doing those unlawful acts a penalty is prescribed as a punishment. In the very important case of Huntington v. Attrill, 146 U. S. 657, 13 Sup. Ct. 224, 36 L. Ed. 1123, the Supreme Court had before it the question of whether a certain statute of New York was a penal statute, within the meaning of that phrase in the rule that one state will not enforce the penal or criminal laws of another. Huntington had obtained a judgment in New York upon which he brought a suit in Maryland. The Maryland court had refused to enforce the

judgment, or to give it the full faith and credit required by the Constitution of the United States, because in its opinion the judgment was based upon a penal statute of New York, and in such cases it is clearly established that the constitutional provision referred to does not apply. The opinion of the Supreme Court, delivered by Mr. Justice Gray, was elaborate, and clearly stated the criteria upon which the question was determinable. We need not here do more than extract such parts of the opinion as are decisive of the question we are trying to solve. At page 667 of 146 U. S., at page 227 of 13 Sup. Ct. (36 L. Ed. 1123), it is said:

"Penal laws, strictly and properly, are those imposing punishment for an offense committed against the state, and which, by the English and American Constitutions, the executive of the state has the power to pardon. Statutes giving a private action against the wrongdoer are sometimes spoken of as penal in their nature, but in such cases it has been pointed out that neither the liability imposed nor the remedy given is strictly penal."

At page 668 of 146 U. S., at page 228, of 13 Sup. Ct. (36 L. Ed. 1123), the opinion continues as follows:

"The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual, according to the familiar classification of Blackstone: 'Wrongs are divisible into two sorts or species: Private wrongs and public wrongs. The former are an infringement or privation of the private or civil rights belonging to individuals, considered as individuals, and are thereupon frequently termed "civil injuries." The latter are a breach and violation of public rights and duties, which affect the whole community, considered as a community, and are distinguished by the harsher appellation of "crimes and misdemeanors."' 3 Bl. Com. 2."

While we only quote these short parts of it, the entire opinion is most instructive. See, also, Lees v. U. S., 150 U. S. 480, 14 Sup. Ct. 163, 37 L. Ed. 1150.

The safety appliance act makes certain things "unlawful." It imposes penalties. Those penalties go to the United States, and not to individual persons, and indubitably the Chief Executive might grant pardons to those who violate its provisions.

Under these tests the conclusion is reached that the safety appliance act is a criminal law, and that all violations of its provisions are, in the broad sense, crimes or misdemeanors. Nor can this result be changed by the fact that under section 8 in certain contingencies an employé's suit for damages shall not be defeated by the doctrine of "assumed risks." As pointed out in the opinion in the Huntington Case, a statute may embrace provisions which relate to civil rights, as well as provisions which relate to public offenses, but that does not change the essential nature of either class of provisions.

Nor does it affect the result here that section 4 of the act provides that the penalties it prescribes shall be recovered by "suit." While in case of capital or other infamous crimes it is otherwise under the fifth amendment to the Constitution, yet in misdemeanor cases indictments are not always necessary, and, as stated by Bouvier in his Law Dictionary, even an indictment is a "suit." Whatever form the pleading in the "suit" may take, either that of indictment, information, or petition, the character of the safety appliance act remains the same, viz., it is a criminal statute creating public offenses, and when one is accused of

violating its provisions his trial must be governed by the general rules which govern in other like cases. Having ascertained the character of the enactment, we are to inquire as to the rules which must govern its interpretation. And this inquiry is relieved of all doubt in cases where the legislative intent is "obvious," by the opinion of the Supreme Court in Johnson v. Southern Pacific Co., 196 U. S. 17, 18, 25 Sup. Ct. 161, 162, 49 L. Ed. 363, wherein the court, through Mr. Chief Justice Fuller, said:

"Moreover it is settled that, though penal laws are to be construed strictly, yet the intention of the Legislature must govern in the construction of penal as well as other statutes; and they are not to be construed so strictly as to defeat the obvious intention of the Legislature. United States v. Lacher, 134 U. S. 624, 10 Sup. Ct. 625, 33 L. Ed. 1080."

If in any essential respect, however, the legislative intent is not fairly to be called "obvious," then we may assume that we are to be governed by other rules in interpreting it. Where the provisions of a statute cannot fairly be called "obvious," and where, therefore, construction must be resorted to to ascertain the legislative intent, the following rules may be invoked, viz.:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will also, therefore, be presumed that the Legislature intended exceptions to its language, which would avoid results of that character." United States v. Kirby, 7 Wall. 486, 487, 19 L. Ed. 278.

In Carlisle v. United States, 16 Wall. 153, 21 L. Ed. 426, the rule is thus stated:

"All general terms in statutes should be limited in their application, so as not to lead to injustice or oppression, * * * if that be possible. It will be presumed that the exceptions were intended which avoid results of that character."

Blackstone has pointed out that statutes which forbade the laying of hands on a priest and punished all who drew blood in the streets should not be literally construed, lest the friend of the priest on the one hand, or the surgeon on the other, might be hanged.

Bishop, in his work on Statutory Crimes (section 82), says that:

"The interpretation should lean strongly to avoid absurd consequences, injustice, and even great inconvenience; for the legislative meaning is to be carried out, and it cannot be supposed to be any of these."

In many civil suits the Supreme Court has restricted the literal meaning of language used in statutes, where it was supposed that Congress did not intend that a case should be included therein. See United States v. Bell Telephone Co., 159 U. S. 550, 16 Sup. Ct. 69, 40 L. Ed. 255. And this court, in construing certain provisions of the act of June 29, 1906 (34 Stat. 584, c. 3591 [U. S. Comp. St. Supp. 1907, p. 892]), commonly called the "Rate Bill," invoked and applied these principles in Mottley v. L. & N. R. R. Co., 150 Fed. 406. If they should be applied in civil causes, for still greater reasons should criminal statutes be construed sensibly, and so as to avoid injustice and oppression in cases where it may be fairly presumed that such results were not contemplated by Congress in its use of general language.

Assuming that we have correctly ascertained the character of the safety appliance act so far as it is applicable to the cases before us, as well as the rules by which we are to construe it in its application to them, it follows that in the hearing and disposition of them we are to recognize certain elementary rules of criminal jurisprudence, among the most essential of which are, first, that the defendant is presumed to be innocent; second, that he cannot be found guilty until the evidence removes all reasonable doubt of his guilt (see The Burdett, 9 Pet. 690, 9 L. Ed. 273, and Chaffee v. United States, 18 Wall. 545, 21 L. Ed. 908) ; third, that the burden of proof rests upon the United States to show beyond a reasonable doubt the existence of every element necessary to constitute the offense (see Clyatt v. United States, 197 U. S. 207, 25 Sup. Ct. 429, 49 L. Ed. 726; Kirby v. United States, 174 U. S. 55, 19 Sup. Ct. 574, 43 L. Ed. 890) ; and, fourth, that this burden continues throughout the case and never shifts to the defendant (Agnew v. United States, 165 U. S. 50, 17 Sup. Ct. 235, 41 L. Ed. 624). It cannot be presumed that, even if Congress had power to nullify any of those fundamental rules, it intended to do so by enacting the law in question.

Now, one of the necessary results of the presumption of innocence is that you cannot presume the existence of one factor or element of a public offense from the proved existence of another, unless the one to be presumed logically and necessarily infers the existence of the other, such, for example, as intent, which may, even in a criminal case, be presumed from satisfactory evidence of the voluntary doing of certain acts which unmistakably indicate the quo animo. Said the Supreme Court in Clyatt v. United States, 197 U. S., at page 222, 25 Sup. Ct., at page 433 (49 L. Ed. 726) :

"No matter how severe may be the condemnation which is due to the conduct of a party charged with a criminal offense, it is the imperative duty of a court to see that all the elements of his crime are proved, or at least that testimony is offered which justifies a jury in finding those elements. Only in the exact administration of the law will justice in the long run be done and the confidence of the public in such administration be maintained."

In the cases before us the testimony showed that the cars had certainly at one time been equipped in the manner required by law, and we cannot presume that any part of the required equipment was imperfect when the respective cars had, some time previously to the discovery of the defects, been started on their interstate journeys, inasmuch as, with one or two exceptions, there was no evidence whatever to the effect that the safety appliances were in any wise defective when that previous starting had taken place. The presumption of innocence will leave no room for the inference that the cars were not properly equipped when that journey was begun, especially as no intelligent person can shut his eyes to the fact that the rapid motion, rough jostling and jolting of the trains, and their immense weight may at some time result in injury to such equipment. There cannot be much nicety in the movements of freight trains.

The only offenses imputed to the defendant in these cases is the use of the various cars at the times specified in the pleadings and covered by the evidence. Except these, no other offenses are charged or at-

tempted to be proved. The testimony on behalf of the government shows that nearly every one of the cars had started from the initial point of their respective journeys at least one day, and usually longer, before the inspectors of the United States discovered the defects at some intermediate station. The testimony was very brief, and was directed altogether to what the inspectors then saw. No information was given which might enable the court to determine how long the defect had existed. Obviously, under these circumstances, we could not conclude that any defects existed when the car started several days before. We must, on the contrary, presume that the defects were in some way caused during the long previous journey from the initial point to the point of discovery, and therefore, presuming that no violation of the act occurred until after the cars had left the original starting points, and having ascertained from the clear and explicit evidence offered by the United States that defects were found during the subsequent journey, we come to the point where our greatest difficulty begins.

We should not lightly suppose that Congress intended, in case a properly equipped car started on its interstate journey with all the required safety appliances in perfect condition, but some part of which afterwards, in its rough and rapid journey, in some unknown way and at some time when the fact was practically, if not actually, undiscoverable, was broken or otherwise made defective, that the running of that car for the least distance under those circumstances should be held to be a criminal offense. Yet such is the contention for the United States, and it is true that the act, literally construed, would lead to that result and would embrace just such a case. To make crimes out of such inevitable, unavoidable, and unintentional acts, of the happening of which the carrier would usually be unconscious, would obviously be unjust and oppressive, and in a certain sense absurd for that reason. It would be shocking to any well-regulated moral sense to uphold the contention if only an individual citizen were involved, and as we know of no rule that differentiates one sort of person from another in the application of the rules of criminal law, we cannot willingly hold that such was the intention of Congress, even though the language used might literally indicate it. We are not, however, permitted to depart from the words of the act of Congress, or to read exceptions into it, unless upon established principles of interpretation which would authorize it. Some departure from a literal construction may be admissible in this instance; but, if so, we must not only find the principles upon which that course may be justified, but also the points where we may begin and where we must end; and this, we think, has been done in the authorities we have cited.

It was insisted on behalf of the government that the statute should be construed with the utmost strictness, and so literally as to make it a criminal offense under the statute if the car was used or operated for one moment, even at night, after the breakage of any part of the required equipment, even though such breakage occurred while the train was in rapid motion between stations, when it was impossible for anybody connected with its operations to ascertain the facts. In short, the contention was that the act should be construed in the strictest and most literal manner, without regard to any other considerations whatever. If this con-

tention be sound, nothing could be simpler, and the government was accordingly content to prove, as it did by two of its inspectors, that they passed alongside of the defendant's trains while at intermediate stations upon the several occasions involved and discovered the defects alleged in the respective paragraphs of the petition, and saw the cars proceed on their journey in that condition. It was also shown that this was done without in any wise informing any of the employés of the defendant of the defects. This was the course pursued in one instance at Fulton, Ky., where at least seven separate couplings had been ascertained to be out of repair in one train, although the defects may have endangered the lives of the crew in charge of that train during the trip to its destination, and although several of these defects could have been very easily repaired at that point if their existence had been disclosed. If the inspectors had pointed out the defects, and if those defects had not been repaired before the cars were moved (if under the circumstances that were reasonably possible), the offense would certainly have been complete. And if the repairs had then been made the object of the law would have been accomplished, and the protection of the train hands would have been cared for so far as the safety appliances were concerned. The inspectors, however, seem to have thought it to be their duty to permit defectively equipped cars to move without giving any information that would have enabled the defendant to remove the dangers to the crew by supplying or repairing the defects.

On the other hand, it was insisted that the statute should be so construed as not to visit criminal consequences upon a defendant in cases where it had started its cars with the proper equipment, but which, during the journey, had become deficient from unavoidable occurrences and under circumstances where the discovery of needed repairs was in most instances impossible. It was urged that the construction contended for by the government would lead to gross injustice and oppression and to the absurd consequences of punishing one for a wholly involuntary act, the doing of which could not be discovered until a greater or less time had elapsed after the offense had been completed. The defendant accordingly, while complaining of the impossibility of being able to show the exact facts at all times in reference to the innumerable couplings and handholds on the vast number of cars hauled, offered evidence tending to show that it had inspected all its cars; that it had not discovered the defects alleged, unless in one or two instances, in which the cars had to be moved short distances in order to reach a point where repairing was possible. And thus we are brought to the question whether, if safety appliances, which are in good condition when the journey of a car on which interstate traffic is being carried begins, afterwards, without the knowledge of the carrier, get broken or otherwise out of repair, it is sufficient proof of the violation of the law to show that fact simply, without also showing that the defendant had learned of the defect or had had reasonable opportunity to do so. Manifestly the act does not contain any words implying that the use of the car without the required safety appliance equipment shall be with intent to violate the statute, or be knowingly and willfully done; nor, indeed, does the language make any exceptions where

an unavoidable accident impairs or destroys the operative powers of any of these appliances while the train in which the car is placed is moving on its journey. Speaking generally, the rule is that in such cases we cannot by construction take from nor add to the language used by Congress, but what we are to ascertain in these cases is, not what general rules require, but whether there are any exceptions to those general rules, and, if any, what they are. The authorities we have cited seem clearly to show that, if a strict and literal construction would lead to manifest injustice and oppression, then the language used should be so construed as to avoid those results. The defendant is a common carrier, engaged in the performance of important duties to the public, involving great and various obligations, to which it is strictly held. For the most part the several things alleged against it in these cases were the result of what had occurred while its trains were in motion between stations on its railroad. Those occurrences were practically inevitable in the ordinary operation of its trains. It was impossible to avoid them, or to know of them until long afterwards; and, however it may strike others, in the opinion of this court it would obviously be unjust and oppressive to so construe the safety appliance act as to make such occurrences criminal offenses under its provisions, unless the defendant had reasonable opportunity to learn of them before it afterwards used its car in hauling interstate traffic. For this reason the court readily yields to those rules of construction fixed by the Supreme Court in the cases cited, and by which it can properly construe the act upon canons of interpretation which justify and demand the limitation of its general language within the bounds we shall indicate.

In support of their respective contentions several opinions were cited upon the one side or the other. Such, for example: United States v. Southern Railway Co. (D. C.) 135 Fed. 122; Same v. P., C., C. & St. L. Ry. (D. C.) 143 Fed. 360; Same v. N. P. Terminal Co. (D. C.) 144 Fed. 861; Same v. Indiana Harbor R. R. Co. (D. C.) 157 Fed. 565; Same v. C., B. & Q. R. Co. (D. C.) 156 Fed. 180; Same v. Great Northern Ry. Co. (D. C.) 150 Fed. 229; Same v. Southern Pacific Co. (D. C.) 154 Fed. 897; Same v. A., T. & S. F. Ry. (D. C.) 150 Fed. 442; Same v. St. L., I. M. & S. R. R. Co. (D. C.) 154 Fed. 516; Voelker v. C., M. & St. P. Ry. Co. (C. C.) 116 Fed. 867, and the same case in the Circuit Court of Appeals.[1] One of these cases, it will be noted, was an action for damages by an individual, and the others were for the enforcement of the criminal provisions of the statute. While we have been instructed by those cases, we have preferred to look at the questions now in litigation from a point of view somewhat different, and, without going into much elaboration, will state the conclusions reached.

It probably in this connection should not be forgotten that the safety appliance act was intended to promote the safety of the very men who are in charge of the train—men whose duty and interest require them to discover any breakage or defect that might occur; and, if they could not do so, it seems to the court that the literal construction contended for upon the part of the United States would not be a sensible construction, but would work out, probably in most instances, the pal-

1 129 Fed. 522, 65 C. C. A. 226, 70 L. R. A. 264.

pably unjust and oppressive result of inflicting a punishment for an unavoidable act of which the offender was at the time of its commission necessarily unconscious and without any sort of intention of doing a wrong. As Congress must be presumed not to have intended such a result, we should hold that it did not intend to punish the unavoidable and unconscious doing even of an otherwise unlawful act. This view is emphasized by the obvious facts that trains, especially on single-track railroads, could not, without great danger to the traveling public, stop between stations to readjust or put on, for example, a new handhold, or a new pin or clevis, on some car in a freight train, even if the defect were discovered; that in respect to automatic couplers no very great danger to train hands could arise until a point is reached where coupling or uncoupling would be necessary; and that the carrier's duty to the general public should not altogether be forgotten.

We cannot resist the conviction that the most urgent insistence upon a literal construction of the statute would balk in a case where a train running at speed between stations in some way broke some part of the safety appliance equipment. The literal interpretation contended for by the counsel for the United States demands, and counsel insists upon, the conclusion that, if the train proceeds at all for any distance (even the shortest) after the break occurs, the offense is complete, and that it is not for the courts to say that an offense has not been committed, but that it is for the executive officers to decide whether the government will overlook the offense or prosecute it. The courts, however, if appealed to, could hardly yield to a view which would exclude them from the function and the duty of passing upon the proper meaning of the act, and determining for themselves whether a person accused was guilty of a public offense; and in the exercise of that duty they can scarcely fail to say that common sense demands some relaxation from a literal construction in the case supposed. If we relax from it at all, we logically surrender it altogether, and thenceforward our labors must be directed to finding the exact point where we may begin and where we may end in order to reach a sensible and just conclusion as to what should be done in such cases. That some relaxation from the literal construction contended for is unavoidable, is clear, and we think we may best interpret the intention of Congress by holding that the carrier should be made liable when it is shown that a safety appliance equipment has become deficient and inoperative after the interstate journey of the car had begun, if it does not supply the deficiency at the first opportunity after it is actually discovered, or after its discovery could have been made by the use of the utmost care that a highly prudent man would use under the circumstances of the case. The determination of the question of that degree of care would, of course, in some instances, depend upon complex conditions; but the necessity for its determination would seem to be unavoidable, unless we are to have a too literal or a too loose construction of the act in applying it to practical affairs in which the great questions of human safety and necessary business are alike involved. This view seems to the court to approximate as nearly as possible the presumed purpose of Congress to punish intentional or avoidable acts, and not those which

were unknown and absolutely unavoidable when they occurred. To impute to Congress an intent to do the latter would seem to be inadmissible, though we should probably punish in every instance where any deficiency in safety appliances existed when the car was started on its interstate journey. At that point knowledge of the defect could in most, if not all, cases be discovered. But, if the operative functions of such appliances become defective during that journey, then punishment as for a criminal offense should only be visited upon the carrier in cases where he, by the use of the utmost degree of diligence which would be used by a highly prudent person under the circumstances, could have discovered and repaired the defect. A less stringent rule should not, we think, be tolerated.

Assuming, as we must from the evidence and legal presumptions, that each of the offenses alleged in these cases was committed, if at all, while the car was upon an interstate journey, and not before such journey began, we think the government, in order to be entitled to recover the prescribed penalty for the offense, must by the evidence show to the exclusion of a reasonable doubt the following facts: First, that the car was used in hauling interstate traffic; second, that when so used the car was either not equipped or provided with the required safety appliances at all, or else that some part of those appliances had become inoperative; and, third, if, as must be presumed was the case with most of the cars now involved, those appliances were all in good order and condition when the car was originally started on its interstate journey, and afterwards became defective during the transit, then, in order to convict, the evidence must show to the exclusion of a reasonable doubt that the alleged defects had respectively been either in fact discovered by the carrier or else that they could have been discovered and corrected by it by the exercise of the utmost degree of care and diligence which could be expected at the hands of a highly prudent man under similar circumstances.

Having regard to the foregoing propositions and to the rules herein propounded, and which are believed to be correct, but without going into details, we are content to find that the evidence does not remove doubts, which we regard as reasonable, of the guilt of the defendant as charged in paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 13, 19, 20, 21, and 22 in case No. 5, and as charged in paragraphs 1 and 3 in case No. 9, and as to each of the charges covered by those paragraphs the defendant is found not guilty, and each and every of those paragraphs will be dismissed; but we do consider the evidence sufficient to remove all reasonable doubt of the guilt of the defendant as charged in paragraphs 9, 12, 14, 15, 16, 17, 18, 23, and 24 in case No. 5, and as charged in paragraph 2 in case No. 9.

It may be proper to add that the car used as charged in the paragraph 13 of the petition in case No. 5 was duly equipped with the safety appliance alleged to have been defective. The equipment was all there, only the chain had not been connected when the coupling was made. While we have also upon other sufficient grounds found the defendant not guilty under this paragraph, it may be well to note that the statute only makes it unlawful to use a car which is not equipped with the required couplers, and it cannot be held—certainly not upon

any strict construction of this penal act—to make it unlawful for a carrier's employés to fail properly to adjust the appliance with which the car has been and at the time is properly equipped. The act requires equipment, and, although there is no express language to that effect, the act must be construed to mean equipment which, if there, is capable of being operated; but no penalty is imposed, if, being there, it is not in fact efficiently operated by those in charge of the train. Equipment only is the required thing, and not the proper manipulation of that equipment by the employés. In order to fairly construe the statute, we must aid its express terms with the added idea that the car shall not only be equipped, but that equipment shall be kept in good order and repair. We think this addition is as fair and proper as, but no more so than, is the reading into the act of exceptions upon the grounds which we have elaborated. In no event, however, can we construe into it a penalty for what is neither forbidden nor made unlawful.

Furthermore, we may remark that in passing upon the charges made in paragraphs 21 and 23 we have treated the proof as not being sufficient to show that an empty car was used or intended to be used in moving interstate traffic. There was a failure of proof upon that element of the offense charged. The engine, however, which pulled that empty car, and also other cars, was sufficiently shown to have been so used. The case of an empty car, as to which there is no proof as to the purpose of its being hauled, must be different from that of an engine which hauls a train, some of the cars in which are carrying merchandise from one state to another.

Judgment will be entered for a penalty of $100 upon each of the paragraphs in the pleadings where the defendant has been found guilty. This will amount in the aggregate to $1,000 in the two cases, and judgments will be entered accordingly. The costs of both actions will also be adjudged against the defendant.