580

## UNITED STATES v. ATCHISON, T. & S. F. RY. CO.

### Civil Action No. 4906.

District Court, N. D. California, N. D.
July 6, 1945.

Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., Emmet J. Seawell and Thomas O'Hara, Asst. U. S. Attys., both of Sacramento, Cal., and James O. Tolbert, Atty. for Interstate Commerce Commission, of Washington, D. C., for plaintiff United States.

J. C. Gibson and Charles L. Ewing, both of Los Angeles, Cal., for defendant railway.

WELSH, District Judge.

Plaintiff charges defendant, which will hereinafter be referred to as the Santa Fe, with violations of the Acts of Congress known as the Safety Appliance Acts, 45 U.S.C.A. §§ 1–16. All violations are alleged to have taken place between April 4th and April 7th, 1944, in Stockton, California.

The first count sets forth that an uncoupling lever was disconnected from the lock block of a coupler; the second, that the uncoupling lever was fouled by lading; the third, that the lock block of the coupler became inoperable, and the fourth, that the handhold on the right hand side of a car was bent in against said car.

An agreed statement of facts was filed wherein each of the defects was admitted by defendant. Said agreed statement set forth that the Wabash box car involved in the first count was placed on an interchange track between the Southern Pa-

cific Railroad and the Santa Fe; that when so placed on said interchange track by the Southern Pacific, said car was coupled between other cars which were not defective, in such fashion that the other non-defective cars could not be moved or used without the movement of said Wabash box car; that the Santa Fe inspected said cars, discovered the defective condition of said Wabash car and refused to accept the same in that condition; that said car was disconnected upon its removal to the Santa Fe yards with the other cars, and was re-delivered to the Southern Pacific by placing the same on the interchange track; that to repair the defective condition it was necessary to remove the knuckle and lock block and apply complete new uncoupling mechanism.

Similar stipulations were made with reference to a Georgia flat car placed on the interchange track between the Western Pacific Railway System and the Santa Fe, which was in a defective condition because the load thereon had shifted so as to prevent the operation of the uncoupling lever, in order to repair which it was necessary to shift the entire load to clear the uncoupling lever; an A.C.L. box car placed on the interchange track by the Western Pacific on which the lock lift had worn until the anticreep stuck in the knuckle lock, in order to repair which it was necessary to remove the knuckle, free it, put back the lock lifter and apply a link at the top of the lock lifter to prevent it from dropping down and falling in the knuckle lock; and a P.R.R. box car placed on the interchange track by the Western Pacific, in order to repair which it was necessary to straighten out the handhold by the use of a bar.

A map referred to in said agreed statement of facts was introduced at the trial as a joint exhibit. It shows the part of the City of Stockton where the main lines of the three Railroads, interchange tracks and the Mormon Yard of the Santa Fe are located; and that the distance from the Southern Pacific and Santa Fe interchange track to the Santa Fe yard was approximately eight-tenths of a mile, and from the Western Pacific interchange to the Santa Fe yard was approximately seventenths of a mile.

The defendant set forth in its answer that in order to disconnect each of the disabled cars from the remaining cars in said string or train which were not defective, it was necessary to move said string or train of cars from the interchange track to the switch yards of defendant, there to disconnect the same and re-deliver it to the interchange track, and that the handling of the car described was purely incidental to disconnecting it from the remaining cars in the string or train in which it was connected or delivered by the interchange company.

Defendant's counsel argued that the only handling which took place was that which as a practical proposition was incidental to disconnecting the cars in question from the other cars on the track so that the Santa Fe could use the cars which were not defective and not thereby block the interchange track for an indefinite period of time while it might have called on the other railroad companies to go in there and switch out these cars.

R. J. Kingston, Chief Joint Inspector at Stockton, was called as an expert witness by defendant. He explained that in order to switch out certain defective cars it was necessary to move them from the interchange track with the Southern Pacific near square 278 on the map to Mormon Yard No. 1 track, as there was no switch until they arrived at said yard.

Questioned about the possibility of switching the cars at a certain point outside the Mormon Yard, he said it was on the main line of the Santa Fe, that the switch there is governed by a tower and cannot be thrown. He further testified that the defective cars could not have been dropped at another point because there is only a single track there, and that it would have been a hazard to traffic to pull the cars anywhere other than to the Mormon Yard.

He expressed the opinion that it would have been dangerous to repairmen if an attempt had been made to make the repairs on the interchange tracks because there were five or six switch engines "running around there all the time;" whereas on the repair tracks there was the protection of a locked switch. He further testified that the movement of traffic over the main Santa Fe line in this vicinity was heavy during the month of April, and if it were possible to have used the switches which come onto this main line, it would have delayed traffic of the Santa Fe and the Western Pacific to have switched the cars on that track.

582

The witnesses Cleve H. Madison and A. A. Hynds, Inspectors for the Interstate Commerce Commission, expressed opinions somewhat contrary to those of the witness Kingston, but they were not as familiar with the local situation as he. His familiarity was gained from experience on the Stockton interchange transfer over a period of fifteen years.

In a situation comparable to this, involving matters of judgment, it was said: "Upon such a question, involving as it does many elements, the decision of those in charge of the business, if made in good faith, is entitled to serious consideration." United States v. Boston & M. R. R., D.C., 243 F. 795, 796. The decision of the Santa Fe to segregate, as it did, the cars on which the "bad order" tags were placed, appears to have been made in good faith and is entitled to considerable weight as explaining why the penal provisions of the Safety Appliance Acts should not be applied.

United States v. Western & A. Railroad, D.C., 297 F. 482, 484, mentions that the "penalty is laid only on a use of the car." It is conceived that such use must be substantial and primarily connected with actual transportation of persons or property for hire in order for the penal provisions of the statutes to become applicable.

The movement of the cars designated in plaintiff's complaint was purely incidental to returning them to the interchange carriers which had attempted to deliver them to defendant. No use of them for any profitable or productive purpose was made by defendant.

Defendant did not attempt to repair the cars itself, but proceeded to return them to the other carriers as expeditiously as possible. No acceptance of delivery thereof by defendant was evidenced. Instead, defendant proved its rejection of the proffered delivery. The Inspector placed "bad order" tags on all of them. Defendant's employees separated them from the non-defective cars and proceeded to return them to the other carriers to be repaired.

The moving of cars by defendant was simply one step in the process of returning them. Defendant used every effort to avoid use of said cars so that its return of them would be prompt and effective.

In Southern R. Co. v. Snyder, 6 Cir., 187 F. 492, 497, the Court emphasized the necessity for withdrawing defective cars from commercial use. Defendant's actions herein indicated that it complied with the spirit of the statutes in not accepting these cars or employing them commercially, but in proceeding to return them to the interchange carriers.

The present case is regarded as one wherein the principle of reasonableness of interpretation and application of statutory law should be applied. The letter of the statute calls for the exaction of a penalty if any movement whatsoever of cars, defective in the particulars specified in the statute, occurs. The spirit of the law calls for the exaction of the penalty only if the movement is of such substantiality, and under such circumstances, as to defeat the purposes of the enactment. One of the principal purposes was the protection of employees.

Such protection could be afforded in the instances herein involved by the repair of the defective cars. Repairs could properly be made only by moving the cars to points where the interchange carriers responsible for making the same could be reasonably expected to have the facilities for proceeding therewith.

In order to make the returns to these carriers, a certain amount of switching was necessary. Differences of opinion were expressed by witnesses for plaintiff and defendant, but those given for what defendant did were not unreasonable. Among them were these—that switching cars on the main line tracks would have resulted in considerable delay or congestion of traffic; that attempting to make repairs on the interchange tracks would have been dangerous because no blocking was there possible, but reliance could have been had only on "blue flags" as signs of warning; and that the method used by defendant afforded the added protection of the use of blocks.

The Supreme Court said in United States v. Farenholt, 206 U.S. 226, 27 S.Ct. 629, 631, 51 L.Ed. 1036, 1037: "A court is not always confined to the written word. Construction sometimes is to be exercised as well as interpretation. And 'construction is the drawing of conclusions respecting subjects that lie beyond the direct expression of the text, from elements known from and given in the text,—conclusions which are in the spirit, though not within the letter, of the text.'"

In United States v. Illinois Central R., 6 Cir., 170 F. 542, 549, the Court stated:

"It seems clear to us that Congress, having accomplished its purpose by requiring carriers to equip their cars in the manner prescribed and to continue such equipment, was content to leave the incidents of their use to be regulated by the rules and principles of the common law.

"Generally, the accepted rule is that if a given construction of a law leads to such results that it seems harsh, unreasonable, or to be performed with a great excess of difficulty, the court, on seeing such a prospect, will turn back to see if a construction is possible whereby such consequences can be avoided and another construction imposed having a more reasonable result. Such an act, we think, ought not to be so construed as to imply the intention to impose these consequences, unless its provisions are such as to render the construction inevitable. A time-honored rule for the interpretation of statutes forbids it. Said Mr. Justice Field, in delivering the opinion of the Supreme Court in United States v. Kirby, 7 Wall. 482, 19 L.Ed. 278:

" 'All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislation intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter.' "

In United States v. Illinois Central, D. C., 156 F. 182, 190, it was said: "The authorities we have cited seem clearly to show that, if a strict and literal construction would lead to manifest injustice and oppression, then the language used should be so construed as to avoid those results. The defendant is a common carrier, engaged in the performance of important duties to the public, involving great and various obligations, to which it is strictly held. * * * We cannot resist the conviction that the most urgent insistence upon a literal construction of the statute would balk in a case where a train running at speed between stations in some way broke some part of the safety appliance equipment. The literal interpretation contended for by the counsel for the United States demands, and counsel insists upon, the conclusion that, if the train proceeds at all for any distance (even the shortest) after the break occurs, the offense is complete, and that it is not for the courts to say that an offense has not been committed, but that it is for the executive officers to decide whether the government will overlook the offense or prosecute it. The courts, however, if appealed to, could hardly yield to a view which would exclude them from the function and the duty of passing upon the proper meaning of the act, and determining for themselves whether a person accused was guilty of a public offense; and in the exercise of that duty they can scarcely fail to say that common sense demands some relaxation from a literal construction in the case supposed."

This Court agrees with the views above indicated, and holds that common sense demands here sufficient relaxation from a literal construction to permit the defendant Santa Fe to switch the cars herein involved without incurring a penalty.

That leeway should be allowed to railroads with respect to repairs was evidently apparent to Congress when it enacted Section 13 of the Safety Appliance Acts and thereby allowed the hauling of equipment "discovered to be defective or insecure to the nearest available point where such car can be repaired." Necessarily, the determination of what is the "nearest available point" and what is a reasonable movement of equipment involves judicial discretion. Similar determinations of what is reasonable must be made in applying other sections of the Act. When a movement of cars is purely incidental to the return thereof to one interstate carrier by another, the reasonableness of such movement is a matter for determination by the Court.

That the switching done by defendant herein was reasonable, and that no penalty should be exacted therefor, is indicated by the following authorities:

In United States v. Northern Pacific R. Co., 9 Cir., 287 F. 780, 784, the Court said: "It is the duty of the interstate carrier to inspect the cars before receiving them into and hauling them in its trains, and, if found defective, to refuse so to haul them."

In United States v. Louisville R., 6 Cir., 1 F.2d 646, 648, the Illinois Central pushed in upon the Terminal Company's interchange track a cut of some 20 cars; upon inspection, one was found defective, and was marked with a placard showing that it was in bad order and to be returned. The Court analyzed four physically possible courses of action, and commented: "There was no way of completing the re-

jection by a return except in the manner adopted. * * * Statutory niceties aside, there is no appealing reason why one railroad should be penalized for a car movement that would have been lawful if by another road. * * * We are not persuaded that the course which was taken is subject to condemnation. * * * Upon the whole case, we conclude that the Louisville Company correctly interpreted its statutory duty."

In Baltimore & O. S. W. R. Co. v. United States, 6 Cir., 242 F. 420, 425, the Court announced: "In case a defective car is received from a connecting carrier in a string or train of cars, the mere incidental handling of such car by the receiving carrier, refusing to accept it, in such manner as may be necessary to disconnect it from the other cars for redelivery to the connecting carrier and to proceed with the use of the other cars, would not be a use or hauling of such defective car by the receiving carrier which would subject it to the penalties of the Act; such incidental handling of the car not being in contravention of the purposes of the Act, but a necessary step in furtherance thereof."

This Court takes judicial notice that the alleged violations took place in time of war when the burden of traffic on the lines of defendant, and the other railroads herein mentioned, was unusually heavy.

It is therefore believed that defendant should not be held to as strict accountability in relation to the provisions of the Acts under which this suit is prosecuted as under ordinary conditions when more facilities would be available and more time could be taken for determining methods of procedure and execution of the details of operation.

Testimony offered at the trial, and the agreed statement of facts, indicate that defendant was in urgent need of the non-defective cars to which the defective ones were connected. While witnesses for plaintiff expressed the belief that other means of detaching the defective cars might have been used, the evidence as a whole sustains defendant's actions as reasonable and practicable under the circumstances.

It is therefore ordered that defendant be given judgment, without costs, upon findings of fact and conclusions of law to be prepared and submitted by the attorneys for defendant.