## ST. LOUIS & S. F. R. CO. v. DELK.

### (Circuit Court of Appeals, Sixth Circuit. March 3, 1908.)

### No. 1,747.

1. COMMERCE—SAFETY APPLIANCE ACT—MASTER AND SERVANT—INJURIES TO SWITCHMAN.

Where a car loaded with lumber and shipped from another state had not been delivered to the consignee at the time it was stopped in a railroad yard at destination and placed on a side track for repairs to the automatic coupler, which had become defective, the stoppage in the yard was an incident to the transportation, so that the car was still engaged in interstate commerce at the time plaintiff was injured while endeavoring to move it in conducting switching operations on such track, before the repairs had been made, within safety appliance act (Act Cong. March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), requiring carriers engaged in interstate commerce to be equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of going between the ends of the cars.

[Ed. Note.—Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

2. STATUTES—DUTY OF JUDGE TO INTERPRET—"DOUBTS AND DIFFICULTIES."

By "doubts and difficulties" arising in the construction of statutes is not meant those which are engendered by the predilection of the court or its own notions of what the law ought to be, but such doubts and difficulties as are inherent in the nature of the problem to be solved.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 3, pp. 2064, 2167.]

3. RAILROADS—EQUIPMENT OF TRAINS—SAFETY APPLIANCE ACT—CONSTRUCTION —DUTY OF MASTER.

Safety Appliance Act (Act Cong. March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]) is entitled "An act to promote the safety of employés and travelers on railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers," etc. Section 2 provides that after January 1, 1898, no carrier engaged in interstate commerce shall haul or permit to be hauled over its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be coupled without the necessity of men going between the ends of the cars. Section 6 (27 Stat. 532 [U. S. Comp. St. 1901, p. 3175]) declares that any carrier hauling or permitting to be hauled or using any locomotive or car in violation of the act shall be subject to a penalty; and section 8 (27 Stat. 532 [U. S. Comp. St. 1901, p. 3176]) provides that any employé of such carrier who is injured by any locomotive, car, or train used contrary to the act shall not be deemed to have assumed the risk, although continuing in the employment with knowledge of such use. *Held* that, while such act imposes on the carrier the absolute duty of equipping its cars with such couplers in the first instance, and thereafter keep them so equipped, the carrier is only required to use reasonable care after the cars have been so equipped to keep such automatic couplers in repair.

Richards, Circuit Judge, dissenting in part.

In Error to the Circuit Court of the United States for the Western District of Tennessee.

This is an action in which the plaintiff, Delk, sought to recover damages for a personal injury suffered by him, as he alleges, in consequence of the negligence of the railroad company in failing to provide that protection for his safety which the law requires, while he was engaged in coupling freight

cars in its yard at Memphis. At the trial he obtained a verdict, and judgment was entered in his favor. The cause was brought here on writ of error; and upon the suggestion of the Interstate Commerce Commission that the Safety Appliance Act of March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], was involved, and upon its request, and the assent of the defendant in error, this court permitted special counsel for the government to participate in the argument at the hearing and be heard upon the question of the construction and application of the act. This is the principal question in the case, and is the one upon which the judgment of the court is turned. The statement of the facts made by the special counsel in his brief is, with some slight additions, adopted as correct, and is this:

"The car alleged to be defective was what is known as K. C., F. S. & M. No. 21,696. The car was loaded with lumber consigned from Giles, Ark., to Memphis, Tenn. The car arrived in Memphis September 28, 1906, at 4:30 p. m., and was delivered by the plaintiff in error to the Union Railway Company of Memphis, commonly called 'The Belt Line,' October 2d, for delivery to the consignee. The car was returned to the plaintiff in error by the Union Railway Company of Memphis, October 3d, at 7:30 a. m., on account of there being a defect in the coupling and uncoupling appliance on one end of the car. The car was in a string of nine cars on what is known as the 'dead track' in defendant's new yard. This dead track was a team track; that is, the track was so arranged that teams might load from or into the car into or from wagons hauled alongside the car.

"On the morning of October 4, 1906, defendant in error, acting under instructions of the plaintiff in error, undertook to switch certain cars out of the string of nine cars so as to get two empty cars and three coal cars for removal to some other portion of the defendant's line. The cars were on a track extending in the general direction of east and west, the engine being on the western end of the nine cars. The nine cars were drawn off this team track onto the lead track. The easternmost two cars, being empties, were left on the lead track. The remaining seven cars were then pushed back on the team track. The easternmost two cars of the seven cars, loaded with brick, were left on the team track. The remaining five cars were again drawn onto the lead track, and three cars loaded with coal were left thereon. The engine, with the remaining two cars, again went upon the team track, and defendant in error undertook to couple the eastern end of the two cars attached to the engine to the western end of the two cars just left on the team track, but, owing to a defect in the coupler on the eastern end of the two cars attached to the engine, the coupling could not be made without a man going between the ends of the cars. The defect on car K. C., F. S. & M. No. 21,696 was this: The chain connecting the uncoupling lever to the lock pin or lock block was disconnected, owing to a break in the lock pin or lock block. The drawbar also had a lateral motion of four inches. Defendant in error undertook to hold the drawbar away with his foot from the side upon which he stood, so that the two couplers would couple by impact. In so doing, his foot was badly injured. Plaintiff in error had what is known as a car inspector or light repair man in the new yard. It was his duty to make repairs of the kind necessary on this car whenever found by him. When the car was returned by the Belt Railway on account of the defect in the coupler, plaintiff in error's inspector placed a red card about three inches by six inches upon the car, and with a blue pencil wrote on said card, 'Out of order.' This card is what is commonly known as a 'bad order' card. The car had been on this team track from 7:30 a. m., on the 3d until 10 or 11 o'clock on the 4th, when the accident to defendant in error occurred.

"There was evidence tending to show that the inspection was made in the latter part of the 3d, and that the inspector thereupon ordered an employé to go to the repair shops which were some two and a half miles distant and get the material for repairing the coupler, but that the employé did not return until after the accident. The trial court held that the safety appliance act applied to the car with the defective coupler, and that by virtue of section 8 of said act plaintiff in error was denied the defense of assumption of risk on the part of defendant in error, and stated the language of the act to the jury."

C. H. Trimble and Lon O. Hocker, for plaintiff in error.

W. A. Percy and T. K. Kelley, for defendant in error.

L. M. Walter, amicus curiæ, for the Interstate Commerce Commission.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

SEVERENS, Circuit Judge, having made the preceding statement, delivered the opinion of the court.

The question which seems first in order is one raised by the plaintiff in error, and is whether the car to which the defective coupling was attached was at the time of the accident employed in interstate commerce. The plaintiff in error claims that it was not, and was laid by for repairs. But we are inclined to think otherwise. Its cargo had not yet reached its destination, and was not then ready for the delivery to the consignee wherewith the commerce would have ended. Its stoppage in the yard was an incident to the transportation. The injury to the coupler was one easily repaired without being taken to a repair shop, and the car was being hauled upon the track when the accident occurred. Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363; Chicago, M. & St. P. Ry. Co. v. Voelker, 129 Fed. 522, 65 C. C. A. 226, 70 L. R. A. 264.

The principal question involved in this controversy relates to the construction and effect of the safety appliance act, so called, enacted by Congress March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]. The Act is entitled:

"An Act to Promote the Safety of Employees and Travelers upon Railroads by Compelling Common Carriers Engaged in Interstate Commerce to Equip their Cars with Automatic Couplers and Continuous Brakes and their Locomotives with Driving-Wheel Brakes, and for Other Purposes."

Section 2 provides:

"That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its lines any car used in moving interstate traffic not equipped with couplers coupling automatically by impact and which can be uncoupled without the necessity of men going between the ends of the cars."

Section 6 provides:

"That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the provisions of this act, shall be liable to a penalty of one hundred dollars for each and every such violation, to be recovered in a suit or suits to be brought by the United States district attorney in the District Court of the United States having jurisdiction in the locality where such violation shall have been committed."

And section 8 provides:

"That any employee of any such common carrier who may be injured by any locomotive, car, or train in use contrary to the provision of this act shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employment of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge."

The contention for the defendant in error is that the effect of these provisions is such as to have required the railroad company, in the ex-

isting conditions, to have had upon this car an automatic coupler, such as is described in section 2, and, further, to have had it at the time when the plaintiff below undertook to make the coupling in good sound working order, so that he would not have been obliged to go between the cars to effect the coupling; and that it is of no consequence that it had at some time previously, no matter how near, been in good order; or whether the railroad company had been at fault in not sooner having it repaired; in short, that the only question in respect to the railroad company's conduct is whether at the time of the accident it had equipped the car with the prescribed coupling apparatus, and had it then in good order.

On the other hand the railroad company contends that it had complied with its duty if it had equipped the car with the prescribed coupling apparatus, and kept it so equipped, and had used due diligence in endeavoring to keep it in good order. It may be admitted that upon a casual reading of the statute it might be that the impression would be taken that the duty is absolute and without any qualification by the circumstances. The court below gave the law to the jury by stating the language of the statute, and in such a way as to lead the jury to suppose that it imposed an absolute duty to keep the car in order, and applied to the circumstances of the case on trial. But the duty of the court goes deeper than this, where the statute, in order to be understood, requires construction. It is bound to consider the conditions to which the statute applies. And if it is seen that in its practical application doubts and difficulties arise, it becomes its duty to scrutinize the statute, and resolve whether, by a sensible construction of it, those difficulties may be avoided. Being bound to administer the law, it is obliged to determine what the law really means and explain it to the jury. These duties are inseparable, but they are equally obligatory. The general rules of interpretation are presumed to be familiar to the courts, and it is the right of the parties who are affected by the result to have them properly applied. In 2 Sutherland on Statutory Construction, § 453 (2d Ed.) it is said:

"Statutes are but a small part of our jurisprudence. The principles of the common law pervade and permeate everything which is subject to legal regulation. Such law defines rights and wrongs of every description and the remedies for public and private redress. By its principles statutes are read and construed. They supplement or change it, and it adjusts itself to the modification and operates in conjunction and harmony with them. * * * Rules of interpretation and construction are derived from the common law, and since that law constitutes the foundation, and primarily the body and soul of our jurisprudence, every statutory enactment is construed by its light and with reference to its cognate principles."

By "doubts and difficulties" we, of course, do not mean those which are engendered by the predilection of the court or its own notions of what the law ought to be, but doubts and difficulties which are inherent in the nature of the problem to be solved. These propositions we presume no one will deny, and it may be thought a work of supererogation to state them. But they are not always remembered by those who make unthinking haste to reach what they believe to be a desideratum. Questions of difficulty arise in the application of this statute. Some of

them have been solved or attempted to be solved by the courts to which they have been presented.

The first rule of construction which occurs is that we are to have regard to the scope and purpose of the statute, not so much the general purpose, as the immediate purpose of this particular enactment. For, if we look too intently upon some ultimate good we would wish to accomplish, we are very liable to distort the law or make out of it some other enactment than that which the Legislature has in fact passed. We think the immediate purpose of Congress in this enactment, in the respect we are now considering it, is that disclosed by its title, wherein it is declared to be "An act to promote the safety of employees and travelers upon railroads, by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers," etc. The general purpose is to promote the safety of employés and travelers; but the immediate purpose of the act is to prescribe a way of doing this, namely, by compelling common carriers to equip their cars with automatic couplings. The method or means by which the ultimate good is expected to be accomplished is the subject of the enactment. The safety of employés, etc., is a thing beyond, an expected result of the enactment, which latter is the substantive thing before us for interpretation. True, we should have regard to the result intended for it, but we cannot carry into it words foreign to its meaning, or strain those used beyond their fair import. By this reference to the title to the act we do not mean that the title is competent to override any express language in the enacting parts, but simply as a clue or an index pointing to the right construction of what follows. It is of the more significance in that, instead of using general language, it specifically signalizes the very purpose of the act, and embraces the whole of it, differing in this respect from the class of statutes which Mr. Justice Field was considering, and instanced in Hadden v. Barney, 5 Wall. 107, 18 L. Ed. 518, where the subjects of legislation were so heterogeneous that it could not be expected that the title would with any reasonable certainty indicate the scope and purpose of the act. To the extent to which we propose this use of the title we are justified by several decisions of the Supreme Court. United States v. Fisher, 2 Cranch, 358, 2 L. Ed. 304; Church of the Holy Trinity v. United States, 143 U. S. 457, 12 Sup. Ct. 511, 36 L. Ed. 226; Coosaw Mining Co. v. South Carolina, 144 U. S. 550, 12 Sup. Ct. 689, 36 L. Ed. 537; Patterson v. Bark Eudora, 190 U. S. 169, 23 Sup. Ct. 821, 47 L. Ed. 1002; White v. United States, 191 U. S. 545, 24 Sup. Ct. 171, 48 L. Ed. 295. In Charles River Bridge v. Warren Bridge, 11 Pet. 420, at page 611, 9 L. Ed. 773, Mr. Justice Story said:

"The title of the act puts this beyond all controversy; for it is 'an act for incorporating certain persons for the purpose of building a bridge over Charles river, between Boston and Charlestown,' etc. But then we are told that no rule in construing statutes is better settled, than that the title of an act does not constitute any part of the act. If, by this, no more be meant than that the title of an act constitutes no part of its enacting clauses, the accuracy of the position will not be disputed. But if it is meant to say that the title of the act does not belong to it for any purpose of explanation or construction, and that, in no sense, is it any part of the act, I, for one, must deny that there is any such settled principle of law. On the contrary, I understand that

the title of an act (though it is not ordinarily resorted to) may be legitimately resorted to, for the purpose of ascertaining the legislative intention, just as much as any other part of the act. In point of fact, it is usually resorted to whenever it may assist us in removing any ambiguities in the enacting clauses. Thus, in the great case of Sutton's Hospital, 10 Co. 23, 24b, the title of an act of parliament was thought not unworthy to be examined in construing the design of the act. In Boulton v. Bull, 2 H. Bl. 463, 500, the effect of the title of an act was largely insisted upon in the argument as furnishing a key to the intent of the enacting clauses. And Lord Chief Justice Eyre admitted the propriety of the argument, and met it, by saying that, in that case, he would, if necessary, expound the word 'engine,' in the body of the bill, in opposition to the title to it, to mean a 'method,' in order to support the patent."

When we come to the enactment itself we find that in the second section it corresponds with what the title has heralded. It forbids the use of cars which have not been equipped with automatic couplers, which are a little more fully defined by adding that they are to be such as will obviate the necessity of going between the cars to uncouple them, or as we are disposed to think, couple them. And this is all there is of the statute which by direct language imposes the duty upon the carrier in respect to the use of automatic coupling. But it is necessarily implied that the railroad company shall keep up the equipment, for it forbids the use of the cars without it. In this connection it seems proper to refer to the last clause in section 2 which is:

"And which can be uncoupled without the necessity of men going between the ends of the cars."

We understand this to be a part of the description of the type of the automatic couplings with which the cars must be equipped. And further, we may here remark that the coupling with which this car was equipped was of the kind required by the act. Section 6 declares that the use of any car in violation of this provision of the act shall constitute an offense punishable by a fine of $100. And section 8 declares that the employé shall not be deemed to have assumed the risk occasioned by the failure of the railroad company to equip its cars as required by the second section.

Now, the statute clearly and positively devolves upon the railroad company the duty of equipping its cars with those couplers, and makes it a penal offense to use its cars without them. All this is simple enough. The company could make no mistake about it. But we can find no warrant for imposing such drastic consequences upon the failure of the railroad company to at all times and under all circumstances have the couplings in repair. One of the recognized rules of construction of statutes is that we are to look to the state of the law when the statute was enacted in order to see for what it was intended as a substitute, and another is that it is not to be presumed that the statute was intended to displace the former law, whether it be statute or common law, further than was fairly necessary to give it place and operation. Now, prior to this enactment, other methods were employed by railroad companies for coupling their cars—generally, if not universally, by a link and pins. And the law was that in respect of this coupling the company was bound to exercise that reasonable degree of diligence in keeping them in repair which was proportionate to the danger of their use. The rule was expressed in various forms,

but that was the substance. Conceiving that the new form or method of automatic coupling by impact would mitigate the danger to employés, Congress enacted this statute to compel the carrier to substitute the new form for the old in operating its cars; and of course it is necessarily implied that it shall be done in good faith as is always implied in the enactment of laws. If the carrier does this, it has complied with the requirement of the statute, and the old method is displaced by the new. But it is now proposed to add to the obligation of the carrier by requiring that he shall be bound to see that the substituted coupling shall at all times and places be in good order, a burden well nigh to impossible. The coupling apparatus on railroad cars is subject at all times while they are being operated, to almost constant wrench and strain and liability to breakage. Much of the time the cars are connected up in trains running on time schedules, and under orders of train dispatchers which must be observed, or fatal and disastrous consequences ensue. Moreover, accidents to the couplings or unknown defects appear at places more or less remote from repair shops. It is reasonable and just to require that the carrier should exercise a high degree of care to keep the couplings in proper condition. But it seems unjust and unreasonable to say that having fulfilled its utmost duty in this regard, it should be held responsible for conditions which may occur without its fault. We do not say that Congress has not the power to impose such an obligation as it is contended this statute imposes; but what we mean to say is that if a statute seems to impose obligations so extraordinary and difficult to perform the courts would be bound to see whether the language employed is not susceptible of a more reasonable construction. Undoubtedly there are many cases in the multitude of statutes where the command is so imperative and unconditional that there is no escape from an exact and literal observance. The industry of counsel has accumulated a considerable number of them in his brief. In such cases if the statute is within the power of the Legislature, there is, as the phrase goes, "no room for construction," and the business of the court is simply to administer the law as it is written. But this in no wise relieves the court from the duty of construing statutes which are not of that character, but are subject to the amelioration which the common law affords by its rules of construction. But with regard to this statute, on turning back from the consideration of the consequences to the language employed, we find nothing which in terms imposes such an obligation. It is said to be implied; and the singular result is that. instead of shading down the express language of an act so that it shall not have an effect which we cannot suppose to have been intended by the Legislature, we should by implication infer an intent which, if seemingly expressed, we should be bound, if fairly possible, to suppose did not exist. Then, again, the statute is penal. The facts which would be necessary to maintain a criminal prosecution are the same as those which would support a private action. The only difference would be in the greater certainty with which the facts should be proven. And in the construction of such statutes the court is not justified in extending their operation beyond the plain meaning of the language used into regions of doubt and uncertain implications.

In this case we do not think it could be held as matter of law that the

railroad company·was· guilty of a violation of ·the statute. In view of the evidence given at the trial, it was a question for the jury to determine as one of fact whether the railroad company should, if ·it had used reasonable diligence, have put the coupling in repair before the accident happened.

As ,we have said, questions have heretofore arisen in the courts upon the construction and application of this statute, among them the question most fully considered here; and there is some conflict in their decisions. In United· States v. Atchison, T. & S. F. Ry. Co. (D. C.) 150 Fed. 442 (Judge Lewis), Voelker v. Chicago, M. & St. P. Ry. Co. (C. C.) 116 Fed. 867 (Judge Shiras), United States v. Illinois Central R. Co. (D. C.) 156 Fed. 185, Elmore v. Seaboard Air Line R. Co., 130 N. C. 506, 41 S. E. 786, and Missouri Pacific Ry. Co. v. Brinkmeier (Sup. Ct. Kansas, not yet reported) 93 Pac. 621, similar views in regard to this statute to those we have indicated as our own were expressed. It is proper to observe that the view of Judge Shiras in the Voelker Case (C. C.) 116 Fed. 867, are not there so clearly stated as in his charge to the jury printed in the record of that case, with which we have been supplied. Opposed to these decisions are the views expressed in United States v. Southern ·Ry. Co. (D. C.) 135 Fed. 122, by Judge Humphrey; by Judge Whitson in United States v. Great Northern Ry. Co. (D. C.) 150 Fed. 229, and possibly, by the Circuit Court of Appeals for the Eighth Circuit, in Chicago, M. & St. P. Ry. Co. v. Voelker, 129 Fed. 522, 65 C. C. A. 226, 70 L. R. A. 264, where the court was reviewing the ruling of Judge Shiras in· 116 Fed. 867, supra. We say "possibly," because there are several reasons for thinking that the Court of Appeals did not intend to decide anything to the contrary of the construction of the statute which we approve. There were two counts in the petition; one upon the statute, and the other upon the common-law liability for negligence. Upon the first count the court-below had charged the jury in respect to the statutory liability in accordance with the view we take of it, and the Circuit Court of Appeals affirmed that ruling. It appears from the report that the railroad company made three points for reversal, neither of which presented the question here presented. The court negatived each of them, and naturally did not go into questions not raised. It reversed the judgment upon another ground. It seems obvious enough that it is not an adverse decision. If we had thought it ·otherwise, we should have more anxiety about the correctness of our our view. Judge Humphrey expressed· an adverse opinion, but he finally rested his judgment upon another ground. But Judge Whitson cited Judge Humphrey's opinion, and adopted the view which had been expressed by him but not made the final ground of decision.

It is urged that, if the courts fail to give the statute the construction that it imposes an absolute duty, it defeats the purpose of Congress in enacting it, and leaves the obligation of the carrier as vague as before. But we see no reason for this contention. The benefit of the equipment of the cars with that kind of "safety appliances" and the maintenance thereof, which, as we think, was the purpose of the law, is secured. The question about which the difference arises is simply whether, in addition to supplying· and maintaining the appliances, the

carrier is absolutely bound to insure their constant good order, or whether it is bound only to the extent of its best endeavor. The question whether it has fulfilled its duty in the latter respect is no more difficult of determination than such as are constantly arising in cases where negligence is charged in other conditions.

The court below instructed the jury, in substance, that it was competent for them to find that the plaintiff below was guilty of contributory negligence, and if they did that he was not entitled to recover. But the railroad company insists that the evidence was so clear and positive that the court should have given a peremptory instruction that the jury should render their verdict for the defendant on that ground. But as the case must be remanded for a new trial, we need not express our opinion upon evidence which may not assume the same aspect upon the new trial.

The judgment must be reversed with costs, and a new trial awarded.

LURTON, Circuit Judge. I entirely concur in the conclusion of the court and the interpretation given to the car coupler act, but I cannot agree that this car was so clearly "in use" contrary to the provisions of that act, as herein interpreted, as to take that question from the jury. I think the stoppage of this car on the dead track was not in any true sense an incident of its transportation in interstate traffic. True, its journey was not finished, but its further journey had been stopped because the next carrier refused to receive it with this defective coupler. There was evidence tending to show that it was not a case of a temporary stoppage, such as that in Johnson v. Southern Pacific Company, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, but a withdrawal from all use in any kind of traffic until it could be repaired. It was placed on a track where cars needing only light repairs were ordinarily placed and was tagged as in "bad order." There was also evidence tending to show that the effort to couple this car was solely for the purpose of holding the car, against gravity, in its place on this track until it could be repaired. A car withdrawn from its journey and held upon a dead track to be repaired is not in my judgment "a car in use" contrary to the provisions of the car coupler act any more than a car in a shop awaiting repairs. In Johnson v. Sou. Pac. Company, before cited, the dining car having a defective coupler had not been withdrawn from its journey to be repaired. Its stoppage was one usual and incident to its journey, and that it might be returned over its usual route in the ordinary course of the kind of interstate commerce it was habitually engaged in. No question of withdrawal from traffic for the purpose of repairs was in that case. The point decided is well shown by the Chief Justice, where he says:

"Confessedly, this dining car was under the control of Congress while in the act of making its interstate journey, and in our judgment it was equally so when waiting for the train to be made up for the next trip. It was being regularly used in the movement of interstate traffic, and so within the law."

The facts are quite like those recently considered by the Court of Civil Appeals of Tennessee, not yet reported, in the case styled "McLaughlin v. Union Railway Co.," where that court held that a car withdrawn for repairs was not a car in use contrary to the act, and the

movement of such a car necessary to getting it into the shops was not a use which brought the car within the car coupler act. See, also, Railway v. Bowles, 71 Miss. 1003, 15 South. 138, and Taylor v. Boston Railway, 189 Mass. 390, 74 N. E. 591, being cases under state laws similar in character, and presenting in each the question of whether a disabled car being handled as a "bad order" car for purposes incident to repair was a car engaged in service.

RICHARDS, Circuit Judge (dissenting). The car which caused the injury had a defective coupler. It would not couple automatically. As a result, the plaintiff below, under orders, went between it and the car it was to be coupled to, and tried to force a coupling by using his foot. In consequence, his foot was caught in the impact of the cars and seriously injured. In the opinion of the majority, the question is discussed whether the car was being used in interstate traffic, and it was held by one of the judges, a view in which I concur, that the testimony showed the car was being so used. That question being so determined, it seems to me that, under the facts as shown by the record, the court was right in charging the jury as it did.

After the coupler became defective and could not be coupled without going between the ends of the cars, it became unlawful for the railroad company to haul it, or permit it to be hauled, or used, on its line. It then became the duty of the railroad company to withdraw the car from use, and have it repaired to conform with the law before using it further. It did not do this, but continued to use the car in its defective condition. It could only do this under the penalty of the law. The car was defective, liable at any time to cause an accident, and it could not be kept in use at the constant risk of a serious accident, either upon the excuse that it would be inconvenient to withdraw it from the service, or that the company had sent for the required appliance, and would repair the car when it should be received.

Certainly no ground is suggested why the employé, to protect whose life and limb this act was passed, should be deprived of its benefit in a case like the present, where he has already suffered the very injury which a compliance with it would have prevented.

This is a case peculiarly within the provisions of the act. A car loaded and being used in moving interstate traffic was found with a defective coupler. The car was marked "in bad order," and a repair piece sent for. After thus being notified of its condition, the car should have been withdrawn; but it was not, and the company kept on moving it about in connection with other cars, and finally ordered the injured employé to couple it to another car. This he tried to do, with the natural result, and he has been crippled for life. The case amply justifies the verdict, and the judgment should be affirmed.