UNITED STATES v. PHILADELPHIA & R. RY. CO.

(District Court, E. D. Pennsylvania. June 5, 1908.)

No. 6.

RAILROADS—SAFETY APPLIANCE ACT—CONSTRUCTION.

Where a railroad company has had an opportunity to inspect cars used on its line in interstate traffic, its duty to see that they conform to the requirements of Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), is absolute, and it is no defense to an action to enforce the penalty provided for a violation of the act that it exercised due diligence.

[Ed. Note.—Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

On Motion for New Trial.

J. Whitaker Thompson, John C. Swartley, and Luther M. Walter, for the United States.

James F. Campbell, for defendant.

J. B. McPHERSON, District Judge. Since this case was tried, and since the motion under consideration was argued, the Supreme Court of the United States has decided the case of St. Louis, etc., Railway Co. v. Taylor, 28 Sup. Ct. 616, 52 L. Ed. ——, which, as I understand the matter, decides finally the vital questions now before this court. It is true that the Taylor Case was an action against the railway company to recover damages for the death of an employé, while the present suit was brought by the United States to recover a penalty for failure on the part of the defendant to keep certain safety appliances in good order; but the same section of the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]) was construed by the Supreme Court as is now in question, and the construction there put upon it supports the instructions that were given to the jury, and are not complained of, as, I think, the following quotation from Mr. Justice Moody's opinion will make clear. He said, inter alia:

"The plaintiff in error raises another question, which, for the reasons already given, we think of a federal nature. The evidence showed that drawbars which, as originally constructed, are of standard height, are lowered by the natural effect of proper use; that, in addition to the correction of this tendency by general repair, devices called shims, which are metallic wedges of different thickness, are employed to raise the lowered drawbar to the legal standard; and that in the caboose of this train the railroad furnished a sufficient supply of these shims, which it was the duty of the conductor or brakeman to use as occasion demanded. On this state of the evidence the defendant was refused instructions, in substance, that if the defendant furnished cars which were constructed with drawbars of a standard height, and furnished shims to competent inspectors and trainmen, and used reasonable care to keep the drawbars at a reasonable height, it had complied with its statutory duty, and, if the lowering of the drawbar resulted from the failure to use the shims, that was the negligence of a fellow servant, for which the defendant was not responsible. In deciding the questions thus raised, upon which the courts have differed (St. Louis, & S. F. Ry. Co. v. Delk [C. C. A.] 158 Fed. 931), we need not enter into the wilderness of cases upon the common-law duty of the employer to use reasonable care to furnish his employé reasonably safe tools, machinery and appliances, or consider when or how far that duty may be performed by delegating it to suitable persons for whose default the employer is not responsible. In the case before us the liability of the defendant does not grow out of the common-law duty of master to servant. The Congress, not satisfied with the common-law duty and its resulting liability, has prescribed and defined the duty by statute. We have nothing to do but to ascertain and declare the meaning of a few simple words in which the duty is described. It is enacted that 'no cars, either loaded or unloaded, shall be used in interstate traffic which do not comply with the standard.' There is no escape from the meaning of these words. Explanation cannot clarify them, and ought not to be employed to confuse them or lessen their significance. The obvious purpose of the Legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just. If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to one who is injured by it. It is urged that this is a harsh construction. To this we reply that, if it be the true construction, its harshness is no concern of the courts. They have no responsibility for the justice or wisdom of legislation, and no duty except to enforce the law as it is written, unless it is clearly beyond the constitutional power of the lawmaking body. It is said that the liability under the statute, as thus construed,

imposes so great a hardship upon the railroads that it ought not to be supposed that Congress intended it. Certainly the statute ought not to be given an absurd or utterly unreasonable interpretation leading to hardship and injustice, if any other interpretation is reasonably possible; but this argument is a dangerous one, and never should be heeded where the hardship would be occasional and exceptional. It would be better, it was once said by Lord Eldon, to look hardship in the face, rather than break down the rules of law. But when applied to the case at bar the argument of hardship is plausible only when the attention is directed to the material interest of the employer to the exclusion of the interest of the employé and of the public. Where an injury happens through the absence of a safe drawbar, there must be hardship. Such an injury must be an irreparable misfortune to some one. If it must be borne entirely by him who suffers it, that is a hardship to him. If its burden is transferred as far as it is capable of transfer, to the employer, it is a hardship to him. It is quite conceivable that Congress, contemplating the inevitable hardship of such injuries, and hoping to diminish the economic loss to the community resulting from them, should deem it wise to impose their burdens upon those who could measurably control their causes, instead of upon those who are in the main helpless in that regard. Such a policy would be intelligible, and, to say the least, not so unreasonable as to require us to doubt that it was intended, and to seek some unnatural interpretation of common words."

Upon this point the charge to the jury in the present case is as follows:

"Of course, you will see at once—perhaps, you have seen already if you have been thinking at all about the case—that some difficult questions might arise as to when common carriers might be liable, and it is very easy to conceive of situations in which it would be hard to hold them liable under the strict letter of the law. For example, suppose a car started from the point of shipment in perfectly good order, and then through no fault of the carrier something happened to the coupler while the journey was in progress. Of course, under the strict letter of the law, every minute the car was in use after that time there would be a violation of the law; but, I say, that would present a hard case, and if the carrier, under the proper construction of this statute, is liable under such circumstances, of course, there is a certain hardship about the situation. But we have nothing to do with a case of that kind. That may safely be left to be dealt with when the time comes. I give you that as an illustration, and others might be easily thought of. We are dealing with the particular situation disclosed by the evidence, and the jury must confine itself to that, as I intend to do in what I have to say to you.

"Here is a case where a certain number of cars, constituting a train used in interstate traffic—and about that matter there is no controversy—are at rest for a certain length of time, in all cases for more than an hour, in some cases for, I think, several hours, but, at all events, in all of these three cases at rest for more than an hour, and therefore affording an opportunity for inspection for the discovery of defects in these automatic couplers. In a case like that I instruct you that it is the carrier's duty to find any defects that may exist, and, if the carrier fails to find them, then the carrier is liable for the penalty imposed by the statute, because, if the train is used afterwards with the coupler out of order, then, of course, under the precise letter of the statute, the carrier is using a coupler that cannot be coupled automatically by impact or cannot be uncoupled without somebody going between the cars, or perhaps neither operation can be performed as the statute contemplates. In other words, the question of diligence or carefulness on the part of the carrier in inspecting the cars has nothing at all to do with the matter now before you. The obligation is laid upon the carrier by the statute to find, in effect, any defect that may exist, when it has, as it had under these circumstances, the opportunity to discover it, and, if its inspectors do

not discover it, then the carrier is liable for those defects and for the penalty that is imposed for the use of the car having such defects."

Upon the authority of the Taylor Case therefore the motion for a new trial is overruled.