HENRY BRINKMEIER, *Appellant*, v. THE MISSOURI PACIFIC RAILWAY COMPANY, *Appellee*.

No. 16,090.

SYLLABUS BY THE COURT.

1. STIPULATION AS TO FACTS—*Issues Made by Pleadings Not Enlarged—Omissions in Pleadings Not Waived.* A written stipulation as to the existence of certain facts, entered into by the parties to an action for the express purpose of avoiding the necessity of taking depositions, the agreement being that the statements contained may be read in lieu thereof, subject to objections as to competency and relevancy, does not enlarge the issues made by the pleadings or operate as a waiver of any omission therein.

2. RAILROADS—*Federal Safety-appliance Act—Absolute Duty to Keep Equipment in Repair.* The several sections of the act of congress of 1893 (ch. 196; 27 U. S. Stat. at L. p. 531) making it unlawful for railroad companies engaged in interstate com-

merce to use cars not equipped with certain specified appliances are framed upon the same general plan, and notwithstanding any minor differences in their language a declaration by the supreme court of the United States that one of them is intended to impose upon the carrier the absolute duty of keeping in good repair the equipment therein required, irrespective of any question of negligence, determines that a like interpretation is to be given to the others. The first paragraph of the syllabus in *Railway Co. v. Brinkmeier*, 77 Kan. 14, overruled.

Appeal from Sedgwick district court; THOMAS C. WILSON, judge. Opinion filed November 6, 1909. Affirmed.

*C. V. Ferguson, Kos Harris,* and *V. Harris,* for the appellant.

*J. H. Richards,* and *C. E. Benton,* for the appellee; *Smyth & Helm,* of counsel.

*Philip J. Doherty,* for the Interstate Commerce Commission, as *amicus curiæ.*

The opinion of the court was delivered by

MASON, J.: On November 12, 1900, in or near the city of Hutchinson, Kan., Henry Brinkmeier, a brakeman in the employ of the Missouri Pacific Railway Company, was injured while engaged in coupling cars. He sued the company, alleging that his injury was occasioned by various defects in the defendant's equipment, and recovered a judgment, which was reversed by this court on two grounds; namely, that an instruction had been given relating to the federal safety-appliance act which was not in accordance with the interpretation which this court placed thereon, and that the petition did not allege a violation of that statute as it existed when the accident occurred. (*Railway Co. v. Brinkmeier,* 77 Kan. 14.) Upon a new trial, on July 8, 1908, the plaintiff asked leave to amend his petition by adding averments which this court had held to be necessary in order to bring the case under the federal law. The re-

quest was denied, and a demurrer to his evidence was sustained. He brings this proceeding to review these rulings.

The defect in the petition, regarded as an attempt to state a cause of action under the act of congress, was its failure to allege that the car having the defective coupling apparatus which caused the plaintiff's injury was "used in moving interstate traffic." The provision in force at the time of the injury read:

"It shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car *used in moving interstate traffic* not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." (Act of March 2, 1893, ch. 196, § 2; 27 U. S. Stat. at L. p. 531.)

The amendment of 1903 provided that "the provisions and requirements . . . relating to . . . automatic couplers . . . shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the territories and the District of Columbia, and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith." (Act of March 2, 1903, ch. 976, § 1; 32 U. S. Stat. at L. p. 943.)

The petition contained no allusion whatever to interstate commerce except in a statement that the defendant was a corporation doing business as a railway company "as a common carrier into and through the counties of Sedgwick and Reno, in the state of Kansas, and into the states of Colorado, Nebraska, Missouri, Arkansas, Texas, Oklahoma and Indian Territory." This was a sufficient allegation that the company was engaged in interstate commerce, and warrants the inference that the car in question was used on a railroad over which interstate commerce was conducted. Therefore the facts pleaded would have constituted a good cause of action under the letter of the law as it now stands. But prior to the amendment of 1903 the stat-

ute did not apply to any car excepting those "used in moving interstate· traffic." There was nothing in the petition to suggest even remotely that the car the defective equipment of which caused the plaintiff's injury was so used. Therefore, as decided at the former hearing, the petition stated no cause of action under the federal statute. It is urged, however, that the court should have allowed an amendment. The statute of limitation had barred an action based upon the act of congress before leave to amend was asked. It was then too late for such an amendment, under repeated decisions of this court, of which the earliest is *A. T. & S. F. Rld. Co. v. Schroeder*, 56 Kan. 731, where it was said:

"A plaintiff can not deprive a defendant of the benefit of the statute of limitations by ingrafting upon a case commenced in time another cause of action barred by the statute. . . . The statute of limitations, as applied to such new cause of action, treats the action as commenced when the amendment was incorporated into the pleadings, and not as begun when the action itself was commenced." (Syllabus.)

In 1905 a stipulation was signed and filed in the case stating facts showing that the car at the time of the injury was being used in interstate commerce, and this is relied upon as supplying the omission of the petition. The stipulation expressly recited that it was made to avoid the necessity of taking depositions, adding that it might be read in lieu thereof, but that its statements should be subject to objections as to competency and relevancy. An agreement so made could not enlarge the issues made by the pleadings. Its purpose, as clearly indicated by its recitals, was merely to obviate the inconvenience and expense of taking depositions. It had no function except as a substitute for the testimony of witnesses, and even if made before the statute of limitation had run could not have operated as a waiver of any defect in the petition.

The considerations already stated are determinative

of the case and require an affirmance of the judgment, for the evidence did not warrant a recovery independent of the federal statute.   Nevertheless the circumstances give occasion to consider the other question presented—the meaning of that statute.   Section 2 makes it unlawful for any common carrier engaged in interstate commerce by railroad "to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."   Two views have been taken of this provision by courts that have had occasion to construe it.   One view is that congress intended to require railroad companies to equip their cars with automatic couplers, but that when this had been done a company was to be liable for an injury resulting from a failure of the device to work only in case such failure was due to some negligence on its part, according to the ordinary rules.   The other view is that the intention was to do away altogether with the common-law rule making liability depend upon negligence, and to make the carrier absolutely liable for any injury resulting from the use of a car the couplers of which did not in fact couple automatically by impact, even although their failure to do so was not occasioned by any negligence on its part, and could not have been prevented by any practicable degree of diligence.  When this case was here before this court adopted the first stated of these two views, upon grounds set out in the opinion.   Since then, however, an expression of the federal supreme court seems to have committed that tribunal to the other.   In *St. Louis & Iron Mountain Ry. v. Taylor,* 210 U. S. 281, a construction was placed upon that part of the safety-appliance law which provides for the fixing of a standard height of drawbars for freight cars, and forbids the use in interstate traffic of any cars "which do not comply with the standard."   In the opinion it was said:

"The evidence showed that drawbars which, as orig-

inally constructed, are of standard height, are lowered by the natural effect of proper use; that in addition to the correction of this tendency by general repair, devices called shims, which are metallic wedges of different thickness, are employed to raise the lowered drawbar to the legal standard; and that in the caboose of this train the railroad furnished a sufficient supply of these shims, which it was the duty of the conductor or brakeman to use as occasion demanded. On this state of the evidence the defendant was refused instructions, in substance, that if the defendant furnished cars which were constructed with drawbars of a standard height, and furnished shims to competent inspectors and trainmen and used reasonable care to keep the drawbars at a reasonable [the standard?] height, it had complied with its statutory duty, and, if the lowering of the drawbar resulted from the failure to use the shims, that was the negligence of a fellow servant, for which the defendant was not responsible. In deciding the questions thus raised, upon which the courts have differed (*St. Louis & S. F. Ry. v. Delk*, 158 Fed. 931), we need not enter into the wilderness of cases upon the common-law duty of the employer to use reasonable care to furnish his employee reasonably safe tools, machinery and appliances, or consider when and how far that duty may be performed by delegating it to suitable persons for whose default the employer is not responsible. In the case before us the liability of the defendant does not grow out of the common-law duty of master to servant. The congress, not satisfied with the common-law duty and its resulting liability, has prescribed and defined the duty by statute. We have nothing to do but to ascertain and declare the meaning of a few simple words in which the duty is described. It is enacted that 'no cars, either loaded or unloaded, shall be used in interstate traffic which do not comply with the standard.' There is no escape from the meaning of these words. Explanation can not clarify them, and ought not to be employed to confuse them or lessen their significance. The obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just. If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to one who is injured by it.

It is urged that this is a harsh construction. To this we reply that, if it be the true construction, its harshness is no concern of the courts. They have no responsibility for the justice or wisdom of legislation, and no duty except to enforce the law as it is written, unless it is clearly beyond the constitutional power of the lawmaking body. It is said that the liability under the statute, as thus construed, imposes so great a hardship upon the railroads that it ought not to be supposed that congress intended it. Certainly the statute ought not to be given an absurd or utterly unreasonable interpretation leading to hardship and injustice, if any other interpretation is reasonably possible. But this argument is a dangerous one, and never should be heeded where the hardship would be occasional and exceptional. It would be better, it was once said by Lord Eldon, to look hardship in the face rather than break down the rules of law. But when applied to the case at bar the argument of hardship is plausible only when the attention is directed to the material interest of the employer to the exclusion of the interests of the employee and of the public. Where an injury happens through the absence of a safe drawbar there must be hardship. Such an injury must be an irreparable misfortune to some one. If it must be borne entirely by him who suffers it, that is a hardship to him. If its burden is transferred, as far as it is capable of transfer, to the employer, it is a hardship to him. It is quite conceivable that congress, contemplating the inevitable hardship of such injuries, and hoping to diminish the economic loss to the community resulting from them, should deem it wise to impose their burdens upon those who could measurably control their causes, instead of upon those who are in the main helpless in that regard. Such a policy would be intelligible, and, to say the least, not so unreasonable as to require us to doubt that it was intended, and to seek some unnatural interpretation of common words." (Page 294.)

It is true that that case involved only section 5 of the law, relating to the height of drawbars, while the present one involves only section 2, relating to automatic couplers, and there is enough difference in the language of the two sections to afford ground for a reasonable distinction. But the whole act either has for its purpose merely the regulation of the character of appli-

ances to be used—the forms of mechanical devices to be employed—or it has a broader scope and is designed as well to shift the burden of accidental, non-negligent injuries occurring in connection with such appliances from the injured employee, where the common law placed it, to the employer, in accordance with the modern theory that as a matter of legislative policy losses arising from injuries to workmen resulting from the use of complicated machinery should be counted as a part of the cost of production or operation. In declaring that "the obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just" the supreme court characterizes the whole act as one cast in the larger mold. Its interpretation is authoritative and final. It follows that the instructions originally given by the district court as to the effect of the federal statute were correct. But as the statute of limitation had barred an action under the federal law before an attempt was made to amend the petition so as to show that the case fell within that act as it existed when the injury occurred, no recovery by the plaintiff is possible.

The judgment for the defendant is therefore affirmed.