NEAL *v.* ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY CO.

Opinion delivered March 14, 1903.

1. TRIAL—WITHDRAWAL OF CASE FROM JURY.—A case should not be withdrawn from the jury unless it can be said as a matter of law that no recovery can be had upon any reasonable view of the facts which the evidence tends to establish. (Page 447.)

2. SAME—QUESTION FOR JURY—UNIFORMITY OF DRAWBARS.—In an action to recover damages for the death of a brakeman alleged to have been caused by the failure of defendant railway company to comply with the act of Congress of March 2, 1893, requiring companies engaged in interstate commerce to use cars with drawbars of standard and uniform heights, where there was evidence tending to show that at the time of the accident there was a difference of from three to four inches between the centers of the drawbars of the two cars which deceased was trying to couple, and that one of the drawbars passed along the top of the other drawbar, so that the two cars came together and crushed deceased, it was a question for the jury whether there was a failure on the part of the company to comply with the act of Congress, and whether such failure was the cause of deceased's death. (Page 448.)

Appeal from Crawford Circuit Court.

JEPTHA H. EVANS, Judge.

Reversed.

George W. Taylor was employed by the St. Louis, Iron Mountain & Southern Railway Company as a brakeman on one of its freight trains. On the 18th of January, 1899, the train upon which he worked left Van Buren, Arkansas, for Coffeyville, Kansas. The train reached Salisaw, Indian Territory, about four o'clock in the afternoon, and had two cars to be left at that point. For the purpose of putting these cars on the side track, the train was uncoupled, and the engine, with fourteen or fifteen cars attached, was run about half a mile farther west, leaving the caboose and six cars standing on the main line. After the two cars that were to be left at Salisaw were put on the side track, the twelve or thirteen cars which were attached to the engine were pulled out on the main track, and then pushed or kicked back towards the caboose and cars that had been left on the main track. The conductor of the train mounted the front or last car that was being pushed back in order by the use of the brakes to govern the speed of the train. This car upon which the conductor stood was equipped with the old-fashioned link and pin drawbar. It had a capacity of forty thousand pounds, and was loaded with shingles, which weighed some twenty-three or twenty-four thousand pounds. The car farthest to the west of those cars attached to the caboose, and to which the car on which the conductor rode was to be coupled, had a capacity of sixty thousand pounds, and was loaded with lumber, the weight of which was about equal to the capacity of the car. This car was equipped with an automatic coupler, but the drawhead was fixed so that the link and pin coupler could be used when it was necessary to couple to a car having that coupling. Before these cars came together, Taylor went between them, and inserted the link in the drawhead of the car having the automatic coupler. When the cars were nearly together, he endeavored to get from between the cars, and was caught between the grab irons and the car, and was killed.

Johnathan Neal was appointed administrator of the estate, and brought this action against the railway company to recover damages, alleging that the company was guilty of negligence, in that the drawheads on the cars were not of the standard and uniform height required by an act of congress, and that the injury was caused by this breach of duty on the part of the company.

The defendant answered, and denied the charge of negligence,

and denied that it had in any respect failed to comply with the act of Congress mentioned.

After hearing the evidence on the part of the plaintiff, the circuit court held that plaintiff had failed to make out a case, and directed a verdict and judgment for the defendant. Plaintiff appealed.

*Chew & Fitzhugh* and *N. H. Neal,* for appellant.

It was error to direct a verdict for defendant. 33 Ark. 370; 35 Ark. 146; 36 Ark. 451; 39 Ark. 491; 62 Ark. 63; 57 Ark. 461; 66 Ark. 363.

*Dodge & Johnson* and *Oscar L. Miles,* for appellee.

The burden was upon the plaintiff to prove negligence on the part of the defendant, and to overcome the presumptions that the master had furnished suitable and safe appliances, and that, in undertaking his employment as servant, he assumed the hazard which occasioned his injury. Thomp. Neg., 1053; Wood, Mast. & Serv., § 382; Shearman & Redf., Neg., § 99; 46 Ark. 569; 46 Ark. 555; 67 Ark. 301.

RIDDICK, J., (after stating the facts). This is an action against a railway company to recover damages caused by the death of George Taylor, one of its employes. The plaintiff is the administrator of the estate of Taylor, and he alleges that Taylor's death was occasioned by the failure of the company, while engaged in interstate commerce, to provide its cars with drawbars of uniform and standard heights, as required by an act of Congress. The circuit court, after hearing the evidence on the trial, held that plaintiff had failed to make out a case, and directed a verdict for the defendant. The question before us is whether the evidence was sufficient to require that the case be submitted to the jury for its decision.

The practice of directing a verdict for the defendant when it is clear that the evidence is not sufficient to make out a case for plaintiff is a wise one, for it saves time and costs, and expedites the business of the court; but a case should not be withdrawn from the jury in that way unless it can be said as a matter of law that no recovery can be had upon any reasonable view of the facts which the evidence tends to establish. *Catlett* v. *Railway Company,* 57

Ark. 527; *Texas & P. Ry. Co.* v. *Cox*, 145 U. S. 593; 6 Enc. Plead. & Prac. 679-680.

In order to determine whether it was proper to direct a. verdict in this case, we must notice the facts which the evidence tends to establish and also the law bearing on the same.

The act of Congress upon which plaintiff bases his right of action was passed for the protection of employees of railroad companies engaged in interstate commerce and for other purposes. It authorized the interstate commerce commission to promulgate an order that "the standard height of drawbars for freight cars, measured perpendicular from the level of the tops of the rails to the centers of the drawbars, for standard gauge railroads in the United States, shall be 34½ inches, and the maximum variation from such standard height to be allowed between the drawbars of empty and loaded cars shall be three inches." Act of Congress March 2, 1893.

Now, the conductor of the train upon which Taylor was employed testified that, as the two cars which Taylor was endeavoring to couple came together, the witness, who was standing on one of the cars, noticed that the drawhead of the car having the common drawbar was from two to three inches higher than the drawbar of the other car having the automatic coupling. He further stated that the face of a common drawbar is only five or six inches in width, while that of the automatic drawbar is eight inches in width, and it follows that if the centers of these drawbars had been even, the top of the common drawbar would have been an inch or inch and a half lower than the top of the automatic. As this testimony tended to show that, instead of being lower, the top of the common drawbar was from two to three inches higher than the top of the automatic, it also follows that the evidence tends to show that at the time of this accident there was a difference between the centers of the drawbars of the two cars which Taylor was trying to couple of from three to four inches. We can not say that the witness did not use the word "from" in the phrase "from two to three inches" in its exclusive sense, or that he did not mean that the distance between the tops of the drawheads was more than two and not over three inches. 14 Am. & Eng. Enc. Law (2d ed.), 553. That was a question for the jury, and from this testimony they might have found that the difference between the centers of the drawheads was over three inches and more than permitted by law. The automatic drawbar was the lower of the two, and the witness stated that Taylor put the link in the automatic drawbar, and endeavored to

raise it high enough to enter the drawhead of the other car, which was approaching; that it seemed that he could not get it high enough, and that for this reason he dropped it, and undertook to get from between the cars. The common drawbar struck on top of the link in the automatic drawbar, slid along it, and, striking the knuckle on the automatic drawhead, broke it off, and then passed along the top of the automatic drawbar, so that the two cars came together, catching Taylor between the grab irons and causing his death. It seems to us that, under this state of evidence, it was a question for the jury to say whether there was a failure on the part of the company to comply with the order of the interstate commerce commission requiring companies engaged in interstate commerce to use cars with drawbars of standard and uniform heights, and whether this failure to comply with the statute was the cause of Taylor's death. The evidence may not be very satisfactory, for it is doubtful whether the conductor, while on top of the car, could tell accurately the slight difference between the drawbars as they came suddenly together, but the weight of such evidence is a matter for the jury to determine, and not the court. We have arrived at this conclusion, though we reject the contention of counsel for appellant that under the order of the interstate commerce commission the maximum variation of three inches between the centers of the drawbars is permissible only when one of the cars is loaded to its full capacity and the other is entirely empty. We do not think it would be practicable to so construct cars that the distance between the centers of the drawbars should vary in exact proportion to the difference in their loads. It may be practicable to construct them so that when empty the centers of their drawbars will be $34\frac{1}{2}$ inches above the top of the rail, and that when one is loaded and another is empty or only in part loaded, the variation between the centers of their drawbars will not exceed three inches. And, though the language used is not very clear, we think that this is all that the law requires.

Counsel for appellant contend that there is no evidence to show that the centers of the draft line of the drawheads of these two cars were not even, and therefore no evidence to show that the variation in the draft line of the two cars was more than that permitted by the act of Congress. But the act of Congress does not require that the draft line of cars used in interstate commerce should be even, but requires that the centers of the drawbars should be of the standard and uniform height mentioned in the act. The act

says nothing about draft line, but requires that the centers of the drawbars should be of uniform height, with the exception that a variation is permitted between loaded and unloaded cars. For this reason the failure to show what the variation was between the centers of the draft line of the drawbars on these two cars was not material.

Again, counsel for appellant contend that, if it be admitted that the drawbars were defective, still there is no evidence that the defendant had notice of the defect, and that on that ground plaintiff failed to make out his case.

It is true that, as a general rule, the master is only bound to use ordinary care to provide suitable and safe machinery for the servant, and is liable for damages caused by defective machinery only when the defect is the result of negligence on his part, as where he neglected to repair the defect after having notice of the same, or when by the use of ordinary care he would have known that the machinery or appliances were defective. In such cases the plaintiff must show knowledge of the defect on the part of the master, or that his lack of knowledge was due to negligence, for the mere fact of an injury caused by a defect does not of itself make out a case of negligence. But it is different where the injury is caused by a violation of a statutory duty on the part of the master. The statute upon which this case is based does not say that the company shall use ordinary care to provide its cars with drawbars of a certain height, but it imposes as a positive duty upon railway companies that they shall do so. Where it is shown that the company has violated this statutory duty, that fact, of itself, makes out, if not a case of negligence *per se,* a *prima facie* case of negligence sufficient to go to the jury, if it be also shown that the injury was caused by this failure of the company. 3 Elliott, Railroads, § 1155; Dressler, Employers' Liability, § 51.

It must, of course, be shown that the failure of the company to comply with the statutory requirement was the proximate cause of the injury, or that it contributed to the injury. If in this case the proximate cause of the injury was the great and unusual force with which the cars were pushed or kicked back against the other cars, then, if that was caused by the act of a fellow servant, plaintiff could not recover. But this carelessness of a fellow-servant would not prevent a recovery if the failure of the master to provide the kind of drawbars required by the statute also contributed to the injury. The contributory negligence of the plaintiff or the

party injured is usually a good defense, but the fact that the negligence of a third person contributed with that of the master to cause the injury is no defense, for in such a case each of the wrongdoers is responsible for the entire injury. The plaintiff can have but one recovery, but in such a case he has the option to sue either or both of the parties that caused his injury. *Chicago, etc., Ry. Co. v. Chambers,* 68 Fed. 148.

The act of Congress requiring railroad companies to equip their cars with drawbars of standard and uniform heights specifically provides that an employee injured by the failure of a company to comply with the act shall not be deemed to have assumed the risk by reason of his knowledge that the company had not complied with the statute, and there is no question of assumed risk presented.

After consideration of the law and the evidence in this case, we are of the opinion that the circuit court erred in directing a verdict for defendant. The judgment is therefore reversed, and a new trial ordered.