ATLANTIC COAST LINE R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit.    March 1, 1909.)

No. 842.

1. RAILROADS (§ 254*) — SAFETY APPLIANCE ACT—COMPLIANCE WITH REQUIREMENTS.

It was the manifest intention of Congress, in the enactment of the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174] to require all common carriers engaged in interstate commerce to keep their cars and engines at all times equipped with proper safety appliances. The degree of diligence required by the statute is of the highest order, and the duty thus imposed is absolute and unconditional. Therefore, any failure on the part of the railroad company to comply with its requirements must necessarily subject the railroad company to the penalty imposed.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

2. RAILROADS (§ 254*)—OPERATION—STATUTORY REGULATION—ACTION FOR PENALTY.

While this suit is in the nature of a penal action, yet it does not follow that it is a criminal prosecution. It is really an action for debt.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*]

3. RAILROADS (§ 254*) — SAFETY APPLIANCE ACT—ACTIONS FOR PENALTY—COMPLAINT.

A complaint under the federal safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174], alleging that the violation occurred "on or about" a particular date, is not vague and indefinite. Pleading in a civil suit need not be as specific in alleging dates as in a criminal proceeding.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 254.*]

4. STATUTES (§ 184*)—CONSTRUCTION—MODIFICATION BY COURT.

Even admitting that the requirements of the safety appliance act (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174] are unduly severe and unreasonable, that fact would not justify a modification of the statute by judicial decision. The courts do not possess the power to read an exception into a statute so as to modify or change the nature of the same and thus defeat the purposes for which the law was intended.

[Ed. Note.—For other cases, see Statutes, Dec. Dig. § 184.*]

5. RAILROADS (§ 223*)—MANAGEMENT OF TRAINS.

It has been the policy of our lawmakers to grant railroads certain privileges not enjoyed by private individuals, and, while this is a wise policy and has met with general approval, it is likewise proper that due regard should be had for the rights of those employed by railroads in performing duties that are necessarily dangerous in their character; and it cannot be said to be an unreasonable provision to require railroad companies, enjoying privileges thus conferred upon them, to manage and operate their engines and cars so as to minimize the risk incident to travel and employment.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 223.*]

(Syllabus by the Court.)

In Error to the District Court of the United States for the Eastern District of North Carolina, at Wilmington.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

For opinion below, see 153 Fed. 918.

This was an action brought by the United States to recover 45 penalties of $100 each for violations of Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), known as the "Federal Safety Appliance Act," as amended by Act April 1, 1896, c. 87, 29 Stat. 85, and Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885). The complaint alleges that the defendant is a common carrier engaged in interstate commerce by railroad, and is a corporation organized and doing business under the laws of the states of Virginia, North Carolina, and other states of the United States, having an office and place of business at South Rocky Mount in the state of North Carolina.

Of the offenses made the basis of this prosecution, 41 were violations of section 2 of the act (defective couplings), and 4 were violations of section 4 (failure to have secure grabirons and handholds).

The defendant filed a demurrer to each count, alleging nine specific grounds of demurrer. The court below overruled the demurrer, and this case comes here on writ of error to the District Court of the United States at Wilmington, N. C., for the Eastern district of that state.

George B. Elliott (Junius Davis, on the brief), for plaintiff in error.

Harry Skinner, U. S. Atty., and Philip J. Doherty, Special Asst. U. S. Atty. (Luther M. Walter, Special Asst. U. S. Atty., on the brief), for defendant in error.

Before GOFF and PRITCHARD, Circuit Judges, and MORRIS, District Judge.

PRITCHARD, Circuit Judge (after stating the facts as above). From an inspection of the record it appears that the plaintiff in error assigns nine grounds of demurrer, but only two of the grounds of demurrer thus assigned are relied upon in this court, the first being that the complaint is vague and indefinite in that it alleges that the violation occurred "on or about" a particular date. The court below, in passing upon this point, held that a pleading in a civil suit need not be as specific in alleging dates as in a criminal proceeding, where prosecution is by indictment.

In matters of practice and pleading the United States courts are governed largely by the practice and pleading of the courts of the state where the suit may be instituted. This rule is based upon the provisions of section 914 of the Revised Statutes (U. S. Comp. St. 1901, p. 684), which reads as follows:

"The practice, pleadings, and forms and modes of proceeding in civil causes, other than equity and admiralty causes, in the Circuit and District Courts, shall conform, as near as may be, to the practice, pleadings, and forms and modes of proceeding existing at the time in like causes in the courts of record of the state within which such Circuit or District Courts are held, any rule of court to the contrary notwithstanding."

Therefore we must ascertain what the practice is in this respect in the state courts of North Carolina.

While this suit is in the nature of a penal action, yet it does not follow that it is a criminal prosecution. It is really an action for debt. Therefore it is important that we should carefully consider the rulings of the Supreme Court of North Carolina in such cases.

The case of Lumber Co. v. Railroad, 141 N. C. 171, 53 S. E. 823, was an action to recover penalties of the defendant on account of discrimination and overcharge in the shipment of logs, and in that case

it was held that it was sufficient to allege the time of shipment as between the 15th day of November, 1898, and the 30th day of April, 1901, and that the lower court, in refusing to sustain the demurrer, was within the rule, inasmuch as the defendant could have asked for a bill of particulars. Judge Connor, in delivering the opinion of the court in that case, among other things, said:

"In regard to the exception to the complaint for indefiniteness. as to debts, etc., the defendant might, if it so desired, have asked for a bill of particulars. Revisal 1905, § 494. The ruling of his honor was correct."

In this connection it might be well to consider the rule of the Supreme Court of North Carolina in the case of State v. Long, 143 N. C. 670, 57 S. E. 349, as showing the practice in this respect in criminal procedure in that state. In that case the defendant was charged in the indictment with bigamy. The defendant moved to quash, and also for arrest of judgment, (1) because the bill of indictment did not charge the date of either marriage; (2) because the indictment did not allege where the second marriage took place; (3) because it did not charge that the offense was committed in Rutherford county and in the state of North Carolina.

Chief Justice Clark, speaking for the court, at page 673 of 143 N. C., page 350 of 57 S. E., said:

"It is sufficient to follow the words of the statute, and the date of the marriage is not required to be charged (Revisal 1905, § 3361). Besides, Revisal 1905, § 3255, provides: 'No judgment upon any indictment for felony or misdemeanor shall be stayed or reversed * * * for omitting to state the time at which the offense was committed, where time is not of the essence of the defense.' Citing State v. Burton, 138 N. C. 578, 50 S. E. 214; State v. Arnold, 107 N. C. 864, 11 S. E. 990; State v. Peters, 107 N. C. 883. 12 S. E. 74. * * *"

Again, at page 676 of 143 N. C., page 350 of 57 S. E.:

"If the defendant had wished fuller information in regard to matters not named in the statute as ingredients of the offense, and therefore not required to be charged (State v. Covington, 125 N. C. 642, 34 S. E. 272), so as to prepare his defense, such as the times and places of the marriages, he should have asked for a bill of particulars, as is now provided by Revisal 1905, § 3244. Citing State v. Brady, 107 N. C. 826, 12 S. E. 325; State v. Gates, 107 N. C. 832, 12 S. E. 319; State v. Dunn, 109 N. C. 840. 13 S. E. 881; Townsend v. Williams, 117 N. C. 337, 23 S. E. 461; State v. Pickett, 118 N. C. 1231, 24 S. E. 350; Goldbrick Case, 129 N. C. 657, 40 S. E. 71; State v. Van Pelt, 136 N. C. 639 and 669, 49 S. E. 177, 68 L. R. A. 760."

The case of Conley v. Railroad, 109 N. C. 692, 14 S. E. 303, is cited in support of the contention that the allegation herein is too indefinite as to time by employing the words "on or about" a certain day. While there may be some parts of the opinion in that case in conflict with the ruling announced in the other cases, which we have mentioned, yet that case was overruled by the case of Allen v. Railroad Company, 120 N. C. 548, 27 S. E. 76. Chief Justice Faircloth, who delivered the opinion of the court, among other things, said:

"The demurrer to the sufficiency of the cause stated brings to this court a question. of form or uncertainty in the pleadings and not the merits of the action, and thus costs and delay are incurred which might have been avoided by a proper motion below, as we are to assume that the judge would have granted the proper motion, certainly until it appears otherwise.

"Without commending the form in which the plaintiff has stated his case in the complaint, we think the defendant's remedy was by motion and not by demurrer. *  *  *"

The second paragraph contained in the first cause of action reads as follows:

"Plaintiff further alleges that in violation of the act of Congress known as the 'Safety Appliance Act,' approved March 2, 1893 (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), as amended by the act approved April 1, 1896 (Act April 1, 1896, c. 87, 29 Stat. 85), and as amended by an act approved March 2, 1903 (Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1907, p. 885]), said defendant, on or about April 27, 1906, hauled on its line of railroad one car, to wit, its own, No. 17,486, used in the movement of interstate traffic, to wit, cabbages consigned from Meggetts, in the state of South Carolina, to Newark, in the state of New Jersey."

In the paragraph following it is alleged, as hereinbefore stated, that on or about said date the defendant hauled said car with said traffic over its line from Rocky Mount, in the state of North Carolina, in a northerly direction toward Richmond, etc.

Here we have an allegation in which is stated the number of the car, and the nature of the traffic, as well as the point from which the car was started and the direction in which it was hauled. It seems to us that such an allegation is sufficiently definite to advise the defendant as to the character of the charge which it is called upon to defend, and to enable it to determine with accuracy as to the particular date on which such car was hauled over its line. It is to be presumed that the railroad company keeps a record of its cars, as well as the numbers of the same, and in a case like this, where the number of the car is given, and the kind of traffic it carried on or about a certain date, it would be an easy matter for the officers of the company to examine its books and ascertain definitely as to the day when such car was moved, and thereby be afforded full and ample information as to any facts which it might desire to use in defending an action of this character. However, if counsel for defendant believed that such allegations were too vague and indefinite, they could have availed themselves of the provisions of the North Carolina statute, and, under the practice in that state could have obtained a bill of particulars setting forth in detail all the desired information. This they neglected to do. Following the well-established practice in the courts of that state, we conclude there was no error in the action of the court below in overruling the demurrer.

The other ground relied upon by plaintiff in error in support of its demurrer is that the complaint does not allege that the defect was discovered, or could, by a reasonable inspection, have been discovered, so that the car could have been repaired before it was hauled or moved, as alleged in the complaint. In construing a statute of this character we must constantly keep in mind the purposes for which it was enacted. As was said by the court in the case of Holy Trinity Church v. United States, 143 U. S. 457, 463, 12 Sup. Ct. 511, 513, 36 L. Ed. 226:

"Again, another guide to the meaning of a statute is found in the evil which it is designed to remedy: and for this the court properly looks at contemporaneous events, the situation as it existed, and as it was pressed upon the attention of the legislative body."

On the 3d day of December, 1889, President Harrison, in a message to Congress, in referring to the great loss of human life, owing to a failure on the part of railroad companies to properly equip their cars with safety appliances, among other things, said:

"It is a reproach to our civilization that any class of American workmen, in the pursuit of a useful and necessary occupation, should be subject to a peril of life and limb as great as that of a soldier in time of war."

In the case of United States v. Chicago, R. I. & P. Ry. Co., Judge McPherson, of the Western district of Missouri, in his charge to the jury, referring to the safety appliance law, said:

"It is remedial and preventive, and, if observed, will reduce to a minimum the crippling and killing of employés in this country. As I said yesterday, every one of us can recollect about fifteen or twenty years ago that about four times out of five when you went to shake hands with a railroad employé, either a switchman, brakeman, or a freight conductor that had been raised from a brakeman, you took hold of a crippled hand, fingers gone, sometimes an entire hand or leg gone, because of the extremely hazardous business of railroading."

Also, in the case of Missouri Pacific Railway Co. v. Mackey, 127 U. S. 205, 210, 8 Sup. Ct. 1161, 1163, 32 L. Ed. 107, the Supreme Court of the United States said:

"But the hazardous character of the business of operating a railway would seem to call for special legislation with respect to railroad corporations, having for its object the protection of their employés as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employés, and no objections, therefore, can be made to the legislation on the ground of its making an unjust discrimination. It meets a particular necessity, and all railroad corporations are, without distinction, made subject to the same liabilities."

The loss of life among those employed by railroads had reached such enormous proportions that the attention of the public was arrested thereby, and as a result Congress endeavored to frame legislation so as to protect, as far as possible, persons thus employed and engaged in the performance of duties necessarily hazardous in their character.

The law under which this suit was instituted was enacted on the 2d day of March, 1893, and is entitled:

"An act to promote the safety of employees and travelers upon railroads by compelling common carriers engaged in interstate commerce to equip their cars with automatic couplers and continuous brakes and their locomotives with driving-wheel brakes, and for other purposes."

Section 1 of the act makes it unlawful for a carrier to use a locomotive not equipped with power driving-wheel brakes and appliances for operating the train-brake system. Section 2 makes it unlawful to use a car not equipped with automatic couplers. Section 4 makes it unlawful to use a car not provided with secure grabirons or handholds. Section 5 makes it unlawful to use a car whose drawbars do not conform to the standard height. By section 6 it is provided that the United States shall have a right of action to recover a penalty from the common carrier using or permitting to be hauled or used on its line "any car in violation of the provisions of this act." It is provided by section 8 that whenever any employé is injured by any locomotive, car, or train in use in violation of the provisions of the act

he shall not be deemed to have assumed the risk incident to the use of such car or locomotive.

As already stated, counsel for plaintiff in error insist that the demurrer filed herein should be sustained upon the ground that it is not alleged that the plaintiff in error failed to use due care or ordinary diligence to discover or repair defects, or to ascertain if the cars were equipped with safety appliances. To hold that these allegations are necessary as a basis of this prosecution would be tantamount to holding that if an employé should, while attempting to go between cars, receive injuries in endeavoring to couple them in the condition described in the counts against which this demurrer is urged, either because such cars were not equipped with automatic couplers or because they were equipped and allowed to become defective or out of repair through such service or accident, the burden would be upon him to show that the carrier had been negligent in allowing such coupling to remain in use, and that the doctrine of assumption of risk continues to prevail in that class of cases, notwithstanding section 8, the provisions of which are to the contrary. That the effect of section 8 is to change the relation of master and servant by abrogating the doctrine of assumption of risk, in so far as it relates to this class of cases, is, we think, well settled.

The Supreme Court of the United States, in the case of Southern Railway Co. v. Carson, 194 U. S. 136, 24 Sup. Ct. 609, 48 L. Ed. 907, passed upon this question. In that case the defendant in error was a flagman in the employ of the Southern Railway Company, and while in the performance of his duty endeavored to couple up in a train certain cars which were provided with automatic couplers, one of which "was not in proper condition." Owing to this defective condition, it became necessary for Carson to go between the cars for the purpose of coupling the same, and he was injured as alleged. A suit was instituted in the court of common pleas for Greenville county, S. C., to recover damages, and upon a trial of the same the jury found for the plaintiff against the defendant in the sum of $6,500, and a judgment was entered accordingly. On appeal to the Supreme Court of South Carolina by the railroad company, the judgment of the lower court was affirmed. From the statement of facts it appears that Carson was injured while endeavoring to couple up on a side track of the defendant certain cars standing thereon with other cars that had been "kicked" onto the side track. The cars in question were all equipped with automatic couplers, but, "when plaintiff reached" one of the cars "then to be coupled," he discovered that the coupler was out of order, and it therefore became necessary for "the plaintiff to go between said cars for the purpose of adjusting the coupler, and while he was engaged in the work his arm was caught between the deadwoods and was so badly mangled that it had to be amputated." It appears from an inspection of the transcript of the record in the Supreme Court of the United States that the plaintiff, among other things, averred in his declaration that, while he was engaged in the employ of the defendant company as flagman on a certain freight train, he was directed by the conductor in charge of the train to couple up certain cars then being shifted out of his train with other cars

standing on a side track. It also appears that all of said cars had been provided with automatic couplers, which, when in good condition, rendered it "unnecessary for one, in order to make the said coupling, to go between the said cars"; "that when he reached" the car to be coupled "he ascertained that the coupling pin was out and lying under the drawhead of the coupler," and finding the coupler out of order it became necessary for plaintiff to go between the cars in question in order to properly adjust said pin "with his hand," and before he had succeeded in coupling the same, or had sufficient time to do so, "he heard the cars knocking together," and his arm was caught between the dead blocks of the cars between which he was standing and was "horribly mangled." The plaintiff's evidence shows that the automatic coupling appliance was defective in that there was an absence of a "cotter pin," an appliance about the size of a "tenpenny nail," and that the defect could have been remedied "in two minutes." It further appears that plaintiff neglected to report the defect to the conductor in charge of the train. It also appears that the defendant had no knowledge of the defect in the coupler, and, further, that it was against the company's printed rules (knowledge of which was brought home to the plaintiff), for employés to go between cars for the purpose of making couplings by hand. The trial judge, among other things, charged the jury as follows:

"I charge that any railroad engaged in running trains from state to state, under the law, are required to have automatic couplers, and I charge you further that they are required to keep these appliances in good order; that is, in safe and suitable order. * * * The fact that a servant violates the rules of a master is not of itself negligence, and the jury must, under the circumstances of each particular case, say whether or not upon the occasion in question the servant was justified under the circumstances in violating the said rule, and, if not justifiable, whether or not the violation of said rule was the proximate cause of the injury. * * *

"By the act of Congress it is provided that on and after the 1st day of January, 1898, it shall be unlawful for any common carrier engaged in interstate commerce to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.

"I charge that if you believe that the defendant railroad company was a common carrier engaged in interstate commerce, and was using for the purpose of moving interstate traffic the cars mentioned in the complaint as causing the plaintiff's injury, and that said cars were not equipped with couplers coupling automatically by impact, so as to obviate the necessity of plaintiff going between them to effect the coupling, such failure to provide such automatic couplers was negligence on the part of the railway company, which negligence continued up to the very moment of the collision. If you believe that there was such a collision and injury in consequence thereof, and if you believe that such negligence was the proximate cause of such injury, your verdict should be for the plaintiff."

The defendant railroad company, in the Supreme Court of the state, in assigning error as to that portion of the charge of the lower court that it was the duty of the railroad company to provide suitable appliances and keep them in good condition, contended that the error consisted in this:

"The duty of a master to a servant is to exercise ordinary care in keeping machinery and appliances in order. The charge of the judge imposes this

duty absolutely upon the railway company, practically making it a guarantor of the safe and suitable condition of the coupling apparatus."

As to the charge of the lower court with respect to the duty of the railroads to equip their cars with automatic couplers which would couple automatically by impact, the railroad company assigned error as follows:

"(a) The act of Congress applies only when the railway company fails to use cars equipped with automatic couplers. It does not apply where the railway company has equipped its cars with such couplers, one of which is temporarily out of repair. The complaint alleges, and the plaintiff's evidence shows, that the cars were equipped with automatic couplers, but that one of them was temporarily out of repair; that it could have been repaired in two minutes. The question, therefore, was whether the railroad company had violated its duty to exercise ordinary care in keeping the coupling in repair, but not whether it had complied with the act of Congress. * * *

"(b) It was error to charge that the failure to provide automatic couplers was negligence, which continued up to the very moment of the collision, for the reason that rule 12 (of company's rules) made it the duty of the plaintiff to examine the coupler, and if defective (to) report such fact immediately. The plaintiff admitted that he knew it was defective before he attempted to make the coupling."

The trial judge further charged the jury as follows:

"I charge you that the risk which a railway employé assumes when he enters the employ of a railway company does not extend to such risks as he is exposed to by reason of defective machinery or appliances."

To which charge the defendant railway company assigned errors as follows:

"An employé assumes all risks except those which flow from the master's negligence in his duty in furnishing safe machinery and keeping the same in repair. The charge was erroneous in not so stating."

On appeal to the Supreme Court of the state of South Carolina, that court, in considering the group of exceptions to the charge of the trial judge, which included the above, said that certain cases in that state—

"all hold that it is the duty of the master to furnish safe machinery and appliances to its servants, and also to keep such machinery and appliances in good order. The master is not made a guarantor strictly; but it is his duty to furnish safe machinery and appliances, and to preserve it in good order and repair. * * *

"The act of Congress in relation to couplings to cars engaged in interstate commerce peremptorily demands that carriers of interstate commerce shall use automatic couplers to the cars used by them. This defendant was a carrier of freight of interstate commerce, and of course it was bound by the act of Congress, no matter what rules they may have adopted for the government of their servants. The circuit judge properly stated the rule. It is well known that Congress took control of these matters for wise purposes, among which was the protection of railroad employés. * * * It would be a want of wisdom and a disregard of law for this act of Congress to be emasculated. Courts and the people of this country are obliged to adhere to and be governed by acts of Congress. Of course Congress intended that these automatic couplers should not only be provided and attached to cars, but that such appliances should be kept in proper repair for constant use. It is the law of this state, even if the act of Congress had overlooked this duty of keeping such appliances in good order, which includes proper repair. This exception is overruled."

On writ of error from the Supreme Court of the United States, the Southern Railway Company, as plaintiff in error in that court, assigned errors, among others, as follows:

"(2) The act (March 2, 1893) applies only when the railway company fails to use cars equipped with automatic couplers. It does not apply when the company has equipped its cars with such couplers, one of which is temporarily out of repair."

The charge of the court was as follows:

"If you believe that such cars were not equipped with couplers coupling automatically by impact, so as to obviate the necessity of plaintiff going between them to effect the coupling, such failure to provide such automatic couplers was negligence," etc.

In connection with this assignment of error, counsel for the plaintiff in error submitted to the Supreme Court of the United States the following argument:

"The law was inapplicable to the case, as it appeared beyond dispute in the complaint and in the evidence that the car in question was equipped with automatic couplers, which, when in order, permitted a coupling automatically by impact. It appeared in like manner that there was a certain pin out of the coupler which allowed the coupling pin to be drawn entirely out of the drawhead, and to this extent the coupler was defective. As a matter of fact the car, owing to this defect, was not equipped with a coupler which would work automatically; but plainly the act of Congress should not apply to a temporary defect, one which could be remedied in two minutes, according to plaintiff's own statement. The error of the circuit judge, we submit, was in practically holding that a coupler which in a normal condition complied with the act of Congress would not do so when temporarily out of repair. The jury naturally concluded that, if there was a broken part in the coupler which prevented for the time being an automatic coupling, it was not such a coupling as the law required. The point of abrasion, the hurting point, in the charge was this: If the company had not complied with the act of Congress, the failure to do so was negligence per se; if it had complied with the act and the appliance was temporarily out of repair, the company's negligence in such event became a question of fact for the jury, they passing upon the question whether the company had exercised ordinary care in keeping it in repair. How the little pin got out of the coupling pin no one knows; the car was on a side track near the factory store, in a factory village, where hundreds of people congregated, and the trouble may have been caused by some meddler. Upon the question of ordinary care the jury was not allowed to pass. They were told, if it was in a condition which would not admit of automatic coupling, the company was guilty of negligence under the act of Congress."

The Supreme Court of the United States affirmed the judgments of both the trial and appellate courts of South Carolina. Chief Justice Fuller, who delivered the opinion of the court, said:

"It is objected that the instructions assumed that, if the automatic coupler was out of repair, the company failed to comply with the act of Congress, but we do not think so, and the Supreme Court of the state held that there was no error, as Congress must have intended that the couplers should be kept in proper repair for use, and, moreover, such was the law of the state, even if the act of Congress had not specifically imposed this duty. By this ruling no right specifically set up or claimed under the act of Congress by defendant below was decided against. There was no pretense that the act of Congress provided that the automatic couplers need not be kept in order, and whether the cars in question were used in moving interstate traffic, and whether the coupling appliances were defective or not, were facts left to the jury and determined by their verdict."

The Circuit Court of Appeals for the Eighth Circuit, in the case of United States v. Atchison, Topeka & Santa Fé Railway Co., 163 Fed. 517, held that the duty placed upon the railroads by the act is the same in both instances, and therefore that that which would be deemed a violation in an action to recover for personal injuries is also to be deemed a violation in an action to recover the statutory penalty.

In that case the court followed the decision of the Supreme Court of the United States in the case of St. L., I. M. & S. Ry. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061, holding that the duty imposed upon a railroad company by the Safety Appliance Act is absolute and unconditional. Circuit Judge Van Devanter, in discussing this point, said:

"Stripped of matters about which there is no controversy here, the violation charged consisted in hauling a car, in the usual course of transportation, when one of the couplers thereon was broken and inoperative, so that it could not be coupled or uncoupled without the necessity of a man going between the ends of the cars. The trial was to a jury, and the single question presented to us is whether or not the duty of the defendant, in respect of the maintenance of the coupler in an operative condition, was correctly stated in the portion of the court's charge, which reads:

" 'The act, however, must necessarily have a reasonable construction. These couplings will get out of repair, and it takes time to repair them. It takes time to discover whether or not they are out of repair. It is the duty of the railway companies to use prudence and the ordinary diligence of a business man, keeping in view the purposes of the act, to keep these couplings in repair. * * * And it is for you to determine in this case whether or not the defendant used reasonable care in ascertaining whether the car was in good repair, and then, again, whether the defendant used reasonable care in putting the coupler in good repair, after it ascertained that it was out of repair. If you find that it did use reasonable care in both instances, then it is not liable, and you should return a verdict in favor of the defendant; otherwise, you should find for the United States.'

"Applying to the evidence the law as so interpreted, the jury returned a verdict for the defendant, which the court declined to disturb upon a motion for a new trial. United States v. Atchison, etc., Ry. Co. (D. C.) 150 Fed. 442. That the interpretation of this law of Congress has been attended with difficulty is attested by many varying opinions in the reported cases, and that there are considerations tending to sustain the construction placed upon it by the district court is attested by the opinion rendered upon the motion for a new trial and by sustaining opinions in other cases, notably St. Louis & S. F. Ry. Co. v. Delk, 158 Fed. 931, 86 C. C. A. 95, but, as we read the opinion of the Supreme Court in the more recent case of St. Louis, Iron Mountain & Southern Railway Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061 (Neal v. St. Louis, I. M. & S. R. Co., 71 Ark. 445, 78 S. W. 220; St. Louis, I. M. & S. R. Co. v. Neal, 83 Ark. 591, 98 S. W. 959), it is now authoritatively settled that the duty of the railway company in situations where the congressional law is applicable is not that of exercising reasonable care in maintaining the prescribed safety appliance in operative condition, but is absolute. In that case the common-law rules in respect of the exercise of reasonable care by the master and of the nonliability of the master for the negligence of a fellow servant were invoked by the railway company, and were held by the court to be superseded by the statute; it being said in that connection:

" 'In deciding the questions thus raised, upon which the courts have differed, St. Louis & S. F. Ry. v. Delk, 158 Fed. 931, 86 C. C. A. 95, we need not enter into the wilderness of cases upon the common-law duty of the employer to use reasonable care to furnish his employé reasonably safe tools, machinery, and appliances, or consider when or how far that duty may be performed by delegating it to suitable persons for whose default the employer is not responsible. In the case before us the liability of the defendant does not grow

out of the common-law duty of master to servant. The Congress, not satisfied with the common-law duty and its resulting liability, has prescribed and defined the duty by statute. We have nothing to do but to ascertain and declare the meaning of a few simple words in which the duty is prescribed. It is enacted that "no cars, either loaded or unloaded, shall be used in interstate traffic which do not comply with the standard." There is no escape from the meaning of these words. Explanation cannot clarify them, and ought not to be employed to confuse them or lessen their significance. The obvious purpose of the Legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just.'

"While the defective appliance in that case was a drawbar, and not a coupler, and the action was one to recover damages for the death of an employé, and not a penalty, we perceive nothing in these differences which distinguishes that case from this. As respects the nature of the duty placed upon the railway company, section 5, relating to drawbars, is the same as section 2, relating to couplers, and section 6, relating to the penalty, is expressed in terms which embrace every violation of any provision of the preceding sections. Indeed, a survey of the entire statute leaves no room to doubt that all violations thereof are put in the same category, and that whatever properly would be deemed a violation in an action to recover for personal injuries is to be deemed equally a violation in an action to recover a penalty.

"Because, in view of the later decision in the Taylor Case, the instruction before quoted did not embody a correct statement of the law, the judgment is reversed, with a direction to grant a new trial."

Also in the case of Chicago Junction Railway Co. v. William R. King (decided by the Circuit Court of Appeals for the Seventh Circuit at its October term, 1908) 169 Fed. 372, Circuit Judge Baker, who delivered the opinion of the court, in discussing this phase of the question, said:

"Upon the carrier the statute lays the duty of seeing to it that no cars are hauled or used on its line that are not equipped according to the statutory requirements. This direct statutory duty cannot be evaded by assignment or otherwise. Therefore the act of the conductor who had charge of the train in deciding what should be done with the defective car was the act of the defendant. As to the negligence of the engineer, it is immaterial whether it be taken as that of the defendant or of a fellow servant of plaintiff, for defendant cannot be exempted from liability for its own negligence by reason of the concurrence of another's. Chicago, M. & St. P. R. Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, 28 L. Ed. 787; Monmouth, M. & M. Co. v. Erling, 148 Ill. 533, 36 N. E. 117, 39 Am. St. Rep. 187; So. Pac. Co. v. Allen (Tex.) 106 S. W. 443."

Counsel for plaintiff in error are insistent that the provisions of this statute are subject to an exception that lessens the degree of diligence which would otherwise be required at the hands of railroad companies, but a careful examination of the same convinces us that no such exception is contained therein, and while it is urged that the requirements of the statute are unduly severe and unreasonable, even admitting this to be true, the fact would not justify a modification of the statute by judicial decision. The courts do not possess the power to read an exception into a statute so as to modify or change the nature of the same and thus defeat the purposes for which the law was intended.

In the case of United States v. Colorado & N. W. R. R. Co., 157 Fed. 321, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167, the Circuit Court

of Appeals for the Eighth Circuit, in discussing this phase of the question, said:

"Where the Congress makes no exception from the clear and certain declaration of a statute, there is ordinarily a presumption that it intended to make none.

"By so much the more it is true that where the lawmaking body has made exceptions to the general terms of an act, as in this instance, the presumption is that it intended to make no more. Again, if Congress intended to make this exception, it was a secret intention which the safety appliance acts not only failed to express, but which their terms expressly negatived. It is the intention expressed, or necessarily implied, in 'the law, and that alone, to which courts may lawfully give effect. They may not assume or presume purposes and intentions that are neither expressed nor implied, and then construe into the law the provisions to accomplish these assumed intentions. A secret intention of the lawmaking body cannot be legally interpreted into a statute which is plain and unambiguous and which does not express or imply it."

The contention that this statute works a hardship applies with equal force to any statute which undertakes to control the affairs of individuals or corporations in this way, but in the light of past experience we are inclined to think that this is the only method by which dangers incident to this kind of employment can be minimized. When we contemplate the vast number of accidents resulting from the operation of railroad trains not properly equipped with safety appliances, we are forced to admit the wisdom and fairness of legislation of this kind. It has been the policy of our lawmakers, both state and national, to grant railroad and other public corporations certain privileges not enjoyed by private individuals; and, while this is a wise policy and has met with general approval, it is likewise proper that due regard should be had for the rights of those employed by such corporations in performing duties that are necessarily dangerous in their character, and it cannot be said to be an unreasonable provision to require railroad companies, enjoying privileges 'thus conferred upon them, to manage and operate their engines and cars so as to minimize the risk incident to travel and employment.

To sustain the contention of the defendant company as to the proper construction to be placed upon the provisions of this act would be to render the act nugatory, while on the other hand, if we construe it in accordance with the well-established rules in such cases, we afford life and vitality to the law and thus give expression to the legislative will. In other words, if Congress had the power, in the first instance, to legislate so as to regulate the conduct of railroads for the protection of employés and in the interest of the traveling public, then it must be admitted that it has not, in the passage of this law, transcended its limitation, and any construction short of holding the act to be absolute would leave undisturbed the situation as it existed prior to its enactment, and it would be difficult to imagine a state of facts upon which railroads would be liable for a penalty or where an employe would be able to recover in an action instituted to recover damages for injuries incurred on account of failure to perform the duties imposed by the statute. It was the manifest intention of Congress, in the enactment of this statute, to require all common carriers engaged in interstate commerce to keep their cars and engines at all times

equipped with proper safety appliances. The degree of diligence required by the statute is of the highest order, and the duty thus imposed is absolute and unconditional. Therefore any failure on the part of a railroad company to comply with its requirements must necessarily subject the railroad company to the penalty imposed.

It must be admitted that some of the cases relied upon by plaintiff in error are in conflict with the views entertained by this court. However, after due consideration of all the cases relied upon by plaintiff in error, we are of opinion that they are not controlling in this instance.

For the reasons hereinbefore stated, the judgment of the court below is affirmed.